EMPLOYERS' LIABILITY ASSUR. CORPO-
RATION, LIMITED, OF LONDON, ENG-
LAND, v. WASSON, Bank Com'r.

GIBSON v. SAME.

Nos. 10026, 10027.

Circuit Court of Appeals, Eighth Circuit.

Feb. 12, 1935.

Martin K. Fulk, of Little Rock, Ark. (Henry Donham, of Little Rock, Ark., on the brief), for appellants.

Wallace Townsend, of Little Rock, Ark. (S. S. Jefferies, of Little Rock, Ark., on the brief), for appellee.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

This is a suit in equity brought by appellee to recover upon a fidelity bond executed by appellant Employers' Liability As-

surance Corporation, Limited, of London, England. An accounting was prayed and judgment demanded against Ray S. Gibson, principal, and the Employers' Liability Assurance Corporation, Limited, of London, England, surety. No question is raised as to the form of the action or the sufficiency of the pleadings. The bond is dated April 13, 1931, and obligates the surety to respond to the Union Trust Company for any loss sustained through any act of larceny or embezzlement committed by its employee, Ray S. Gibson, during the period of one year commencing April 13, 1931. The question of liability depends upon the relations of and transactions among Gibson, Union Trust Company, Voss-Hutton Company, and the Wholesalers' Service Corporation. To understand the issues presented, it is necessary to relate the facts in some detail.

In 1930, Gibson organized the Wholesalers' Service Corporation, to finance title retaining installment contracts. The Voss-Hutton Company was an Arkansas corporation engaged, at Little Rock, Ark., in the business of selling automobile supplies and radios at wholesale. At the time of the organization of the company, Voss-Hutton Company was indebted to Union Trust Company. As the Voss-Hutton Company made sales through various retail dealers, it received contracts providing for monthly installment payments, which retained title to the property in Voss-Hutton Company. These contracts were then discounted or sold by Voss-Hutton Company to Wholesalers' Service Corporation (Gibson's company). These contracts the Voss-Hutton Company unqualifiedly indorsed, and the Wholesalers' Service Corporation then took them to the American Exchange Bank of Little Rock, which issued its trust certificate showing that the contracts were held as collateral obligations of the Wholesalers' Service Corporation to the Union Trust Company. The American Exchange Bank obligated itself to return either the collateral notes or their face value to the Union Trust Company. In November, 1930, the American Exchange Bank failed, and commencing in January, 1931, the collateral contracts were handled directly by the Union Trust Company.

At the first meeting of the board of directors of the Wholesalers' Service Corporation, held July 25, 1930, Ray S. Gibson was elected president and general manager, and other officers were also elected. Gibson's salary was fixed at $325 per month,

and as general manager he was authorized to employ office help, to borrow money, collect accounts, deposit to the credit of the corporation, and draw checks upon the account. This corporation began business in August, 1930, borrowing $500, most of which was used for expenses of incorporating, and no other capital was ever put into the business.

Beginning in August, 1930, this company continued to handle business for the Voss-Hutton Company until October, 1931, when the Service Corporation ceased to do business. During its period of operation it dealt exclusively with Voss-Hutton Company, and with no others. On receipt of a contract from the Voss-Hutton Company, the Service Corporation would take it to the Union Trust Company, which would lend the Service Corporation the face value of the contract, and the contract was deposited in the bank as collateral security for payment. The proceeds of the loan would then be deposited in the Union Trust Company to the account of the Wholesalers' Service Corporation, and a check on that account would be given to the Voss-Hutton Company for the face value of the contract, less a carrying charge of 7 per cent., making a gross per annum profit at the rate of 17 or 18 per cent., which represented the gross profit of the Wholesalers' Service Corporation in the transaction. On the loans from the bank, the Wholesalers' Service Corporation agreed to pay 7 per cent. interest per annum.

After pledging these contracts, which were in the nature of title retaining notes, as collateral, the Wholesalers' Service Corporation, with the consent of the bank, undertook the collection of the installments as they became due. Each contract bore the indorsement of the dealer through whom the merchandise was sold, and it was the practice for the Wholesalers' Service Corporation each month to send to the dealer monthly statements, listing all of the contracts handled by such dealer, with the amounts of the monthly payments due thereon. The dealer would then undertake to collect from his customers, the makers of the contracts, and would remit by check to the Wholesalers' Service Corporation the total amount so collected, accompanied by a statement showing the amount to be credited to each purchaser. The Wholesalers' Service Corporation kept a daily record in its cashbook of collections received and deposits made, and individual ledger sheets were kept up-

on each contract, showing the record of payments made. A card index system was also kept, listing individual customer's accounts, and credits as received were placed upon these cards.

For the purpose of reconciling collections which were being made, the Voss-Hutton Company, before delivering contracts to the Wholesalers' Service Corporation, made a record of each contract, showing the name of the maker, the merchandise sold, the amount of the contract, and the due dates of the installments. A. E. Davies, treasurer and bookkeeper of Voss-Hutton Company, once a month went to the office of the Wholesalers' Service Corporation and obtained from the card index there kept a list of the collections which had been received. This was compared with a similar list furnished by the Wholesalers' Service Corporation to the bank.

The Wholesalers' Service Corporation paid on its obligations to the bank by checks on its account. A check for a lump sum would be given, and a list furnished to the bank, showing the name of the makers and the amount with which each contract was to be credited. The only source of income of the Wholesalers' Service Corporation during its period of operation was the 7 per cent. discount or carrying charge which it received on each contract. Checks for all purposes, including operating expenses, were drawn on the only account kept by the Wholesalers' Service Corporation, and the expenses so paid included Gibson's salary.

As Gibson, or the Wholesalers' Service Corporation, was permitted to collect on the pledged contracts, the Union Trust Company applied for and secured a bond written by the United States Fidelity & Guaranty Company to protect it from misapplication of funds. This bond was canceled April 11, 1931, because the Guaranty Company was of the view that Gibson was not an employee of the Union Trust Company. The Union Trust Company then applied to appellant Employers' Liability Assurance Corporation for a similar bond. Gibson made written application dated April 15, 1931, disclosing that he was president and manager of a finance corporation, and that his duties were collection of accounts. This application discloses the Union Trust Company as his employer, and declares that the statements therein contained are true. The Union Trust Company, also for the purpose of procuring the bond, executed an "Employer's Statement for Fidelity Bond." It contains, among others, the following questions and answers:

| Questions | Answers |
|---|---|
| 3. Is the Applicant at present in your employment? and, if so, how long have you employed him, and in what position? | Yes— Several months. |
| 4. Have his duties, while in your service, always been performed in a faithful and satisfactory manner? | Yes. |
| 6. With respect to the duties and responsibilities of the applicant, please reply as fully as possible to the following questions: | |
| A. State position of Applicant, the duties that will devolve on him, and whether authorized to endorse checks. | A. Collection of accounts—not authorized to sign checks. |
| B. In what ways will moneys pass through his hands, by collection, remittances by post, or how? | B. Collection of accounts. |
| C. What is the largest sum he will have in his hands at any one time, and for how long? | C. $1600.00 |
| D. How often and to whom will you require him to render and account of cash received, and pay the same over? | D. Audit made semiannually. |
| E. Are moneys to be paid into the bank by Applicant? If so, how often will the bank-book be inspected and checked? | E. Yes.  Account is checked once each month. |
| F. By whom will moneys be drawn out of bank? | F. By Gibson. |
| H. How often will you balance his cash accounts, and how will you check their accuracy? Please explain fully. | H. Cash account will not be balanced by us. Collections will be checked monthly. |
| I. Will the balance in his hands, if any, be counted and paid over, or how dealt with? | I. All funds are to be paid to banks by Applicant. |
| 7. A. What salary will you pay him, and how will it be paid? | A. None. |
| 10. Is there any cash balance at present due to you from him? | No. |

The application states that the statements therein contained are true, and that they and any further signed statements should be taken as the basis of the contract between the bank and the surety.

On April 20, 1931, Mr. Miller, vice president and insurance officer of the Union Trust Company, wrote a representative of the Employers' Liability Assurance Corporation, inclosing the above application, and, among other things, said: "The notes that are to be deposited as collateral are the monthly notes of the Voss-Hutton Company, Little Rock, Arkansas, who sell their merchandise to merchants thru the State, take their note and in turn they sell these notes to Mr. Gibson. Mr. Gibson attached the note to his note and borrows money from us. Sometimes it becomes necessary that Mr. Gibson take down some of the notes put up as collateral to collect them. Should he put up some notes, or apply the cash on the main note, he is in no way responsible for the validity of the notes. Of course, these notes are checked every month and when the note becomes past due as collateral this is also checked."

The bond as executed contains, among others, the following recital: "It is understood and agreed that any statement in writing relative to the Employees, their conduct, duties, employment, and accounts, the manner of conducting the business of the Employer and other things connected with the issuance of this bond, and any other statements in writing hereafter made by the Employer to the Surety relating to such matters do and shall form a part of this bond or any continuation or continuations thereof and shall be warranties * * *."

On February 5, 1931, more than a month prior to the execution of the bond in question, Mr. Brizzolara, vice president of the Union Trust Company, wrote Mr. Gibson a letter, authorizing him to collect the accounts, and stating that for that purpose Gibson would be considered an employee of the bank, and Gibson indorsed his acceptance of the appointment on the bottom of the letter. This letter was in fact written in an unsuccessful attempt to obviate an objection made by the United States Fidelity & Guaranty Company that Gibson was not an employee of the bank. Brizzolara testified that no change in the relation between Gibson and the bank resulted from this letter, and that Gibson received no salary from the bank, nor any allowance for expenses,

The court found that Gibson embezzled $6,344.79 from the Union Trust Company, and of this amount $3,671.64 had been embezzled by him after the execution of the bond, and awarded judgment against Gibson for the full amount of the embezzlement, and against the Employers' Liability Assurance Corporation for $4,194.84. From the judgment so entered, both the Employers' Liability Assurance Corporation and Gibson have appealed.

The errors assigned are: (1) That the court erred in finding that Gibson committed an embezzlement; (2) that the court erred in finding that Gibson was an employee of the Union Trust Company; (3) that the court erred in failing to hold that the coverage was limited by the letter of April 20, 1931; (4) that the court erred in finding that the bank checked the accounts monthly; (5) that the court erred in holding that the bond was not avoided by breach of warranties, (a) as to examination of the books and correctness of accounts on December 31, 1930, and (b) as to Gibson's nonindebtedness to the bank on April 13, 1931.

It appears that the proceeds of the collections were not fully accounted for by Gibson or his corporation to the Union Trust Company. This was a misappropriation of the funds of the Union Trust Company. This is conceded by appellants, but they urge that there was no such embezzlement as would create a liability on the bond because the money was all deposited to the credit of the Wholesalers' Service Corporation and paid out by the bank upon checks drawn on it by that company for expenses of operation without concealment of facts and without fraud. The evidence shows that all money collected was deposited in the bank, and that the amount of the loss claimed equals the exact amount of the operating loss of the Wholesalers' Service Corporation less the carrying charges made by it. The evidence does not show, however, that the bank was so familiar with the affairs and conduct of the business that it must be held to have consented to the misappropriation of its funds. There is no evidence of such consent as would constitute a defense to a charge of embezzlement. Russell v. State, 112 Ark. 282, 166 S. W. 540; Guenther v. State, 137 Wis. 183, 118 N. W. 640.

It is also contended that the shortage resulting from payment of operating expenses did not show embezzlement because

Gibson used the money not only to pay his own salary, but for other expenses of the corporation. But the act is no less embezzlement because the appropriation may not have been to the embezzler's sole use or benefit. It is sufficient that the money was converted by him, even though it may have been appropriated in part to the use of someone else; nor can we accept the contention that Gibson used the funds in ignorance of the insolvency of his corporation and the inadequacy of the collateral to pay the bank in full, if the expenses of the corporation were charged to the corporation's bank account.

The question of Gibson's employment is challenged. Not only was the letter of February 5, 1931, purporting to appoint Gibson as an employee of the Union Trust Company, written in an attempt to obviate the objection of the United States Fidelity & Guaranty Company that Gibson was not an employee of the bank, but the bank also carried a blanket bond for all its employees, and the insurance company issuing that contract also refused to carry Gibson under its policy. No mention of these facts was made to the appellant Employers' Liability Assurance Corporation. On February 16, 1931, a vice president of the bank wrote to the United States Fidelity & Guaranty Company, stating that: "Mr. Gibson is really in the employ of the Wholesalers Service Corporation, and draws his salary from those people—nothing from the Union Trust Company." Gibson's status had not changed at the time the bond now in question was written. At that time the bank had possession of the collateral and there was a duty resting upon it to make collection. It might have made collection through its regular salaried employees, but instead it chose to use the services of Gibson. Why it preferred that method of handling these items is probably not material, but it is apparent that it was to Gibson's interest and to the interest of his corporation that the collections be made. He was familiar with the work, and doubtless the bank was glad to shift the expense, if possible.

The court found the Wholesalers' Service Corporation to be a fiction, an instrument of convenience which Gibson used, and he was the corporation, and it he. While Gibson received no remuneration from the bank, still the employment or agency was, when acted upon, binding. Commonwealth v. Griffith, 204 Mass. 18, 90 N. E. 394, 25 L. R. A. (N. S.) 957, 134 Am. St. Rep. 645.

Although the bank did not disclose in its application for this bond the facts with reference to the United States Fidelity & Guaranty Company bond, nor the refusal of the blanket insurer to recognize Gibson as an employee insured under its contract, the court has found that there was no fraud or deceit practiced in procuring the bond. The insurance company asked no questions which called for such information, and a failure to disclose even a material fact not inquired about would not ordinarily avoid the contract, unless it appears to have been withheld with fraudulent intent. Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank & Trust Co. (C. C. A. 6) 72 F. 413, 38 L. R. A. 33. Fraud is not to be presumed, but must be proved, and we cannot say that the finding of the court is without support in the evidence, and it concludes appellant on this question. The applications show the essentials of the relation between the bank and Gibson, and the facts there disclosed put the insurer on notice as to Gibson's status. It issued the bond and accepted payment of the premium, and having so done with knowledge of the facts, it is bound by its contract. American Employers' Liability Ins. Co. v. Barr (C. C. A. 8) 68 F. 873.

It is next contended that the liability of the insurance company was limited by the letter of April 20, 1931, above set out. The bond, in form at least, covers the collection of accounts generally, and the application submitted clearly indicates that it was desired to cover the acts of Gibson in collecting this collateral. Under the express provisions of the bond, the letter must be construed as a part of the contract, as the bond was not delivered until after this letter was received. It is, therefore, necessary to construe the instruments together, and, if possible, every part of the contract should be so construed as to be consistent with every other part, and to have effect. In Rushing v. Manhattan Life Ins. Co. (C. C. A. 8) 224 F. 74, 76, this court said: "It is only when the parts of a contract are so radically repugnant that there is no rational construction that will render them effective and accordant that any part must perish. And the intention of the parties must be deduced, not from specific provisions or fragmentary parts of the agreement, but from the entire contract, because the intent is not evidenced by any part or stipulation of it, nor by the contract without any part or provision, but by every part and term so construed, if possible, as to be consistent with

every other part and with the entire agreement."

In Morrill & Whiton Const. Co. v. City of Boston, 186 Mass. 217, 71 N. E. 550, 551, the rule is announced that where, in a contract, "a repugnancy is found between clauses, the one which essentially requires something to be done to effect the general purpose of the contract itself is entitled to greater consideration than the other, which tends to defeat a full performance, and repugnant words may be rejected in favor of a construction which makes effectual the evident purpose of the entire instrument."

Applying these rules to the present contract, we are satisfied that the lower court correctly construed it. Manifestly, the general purpose of the parties was to insure the bank against loss through the misapplication of funds by Gibson. The letter refers to a possible course of conduct in so doing, and indicates that when collecting, he will take, the original contract with him, but whether he should do so or not is an immaterial element of the contract.

■ Appellant insurance company contends that the bond cannot be enforced because a proper examination of the records would have disclosed the use made of the funds by Gibson, and relies strongly on the authority of Maryland Casualty Co. of Baltimore, Md. v. Bank of England (C. C. A. 8) 2 F.(2d) 793.

In the instant case, the court made no finding that the collections made by Gibson were not deposited in the bank to the credit of the Wholesalers' Service Corporation. Appellee insists that collections were made but not entered on the records, but a failure to enter a collection on the books would not constitute conversion of the funds collected, unless the money did not in fact reach the bank. There is evidence that Gibson did not enter all payments on contracts when the money was received, owing to the fact that they were partial remittances on monthly bills to dealers. When a full month's payment was received, it would be credited on one month's payment on all installments. Gibson had eight or ten deposit slips in the drawer of his desk, the amounts of which had not been credited on the cards or books, and his books did not reflect the exact amount because it was withheld. Mr. Hutton testified as follows: "As far as Mr. Gibson would admit collections, they were entered on the books by Mrs. Reotz, his stenographer and bookkeeper. All the entries were made in accordance with his agreement. We would prove them to him as they were made and he would admit it. Over two hundred entries were entered on the books of installments."

He also testified: "I checked Gibson short a payment, collected by Gibson in Hot Springs, and I confronted him with it, and he afterwards paid us in cash. * * * The payment did not go through the books. There were two or three instances like that. * * * I think Charles Paine was another from whom he collected money and didn't credit it, and he paid about half of his title retaining contract. We had to sue and repossess the goods, but he had paid about half of his contract out and Ray Gibson got the money. I do not know the amount, the record will speak for itself."

He further testified: *"I did not say that money was not deposited in the Union Trust Company, but that he got the money and didn't credit it on these cards."* (Italics supplied.)

Mr. Davies, treasurer and bookkeeper for the Voss-Hutton Company, testified that in September he checked the accounts with Mr. Hutton. He said concerning the partial payments: "As we found these collections that were not shown on the books, we would call Mr. Gibson's attention that they were not entered on the cards there, and they were later entered on the cards with his authority and consent."

Relative to partial payments, Gibson testified as to the practice, using a dealer as example, as follows: "He (the dealer) would only send us a partial payment of the total amount, and we had sent him a complete list of the payments due. So all we could do was to hold that in abeyance and deposit the money in the bank, because we never knew whether John Smith had paid or Sally Jones had paid, but we did deposit all these moneys in the Union Trust Company. And it is simply a question of bookkeeping or crediting the account of the customers. * * * I never did collect any money from these collateral accounts that I did not put in the bank. I did not use any of these funds personally. All my operating expenses were paid by check. * * * The books of the Wholesalers Service Company reflected at all times every dollar of moneys the corporation had collected and the amounts disbursed, every deposit and when and what it was for. These entries were made at the time accurately except in

those cases, and the deposit tickets themselves showed where it came from. Mr. Hutton was talking about the deposit tickets in my desk. Yes, they were there in the other desk and they showed the money was deposited. They were not entered in the cash book, and the reason we took the deposit tickets was because they had the names on it. I could not enter them until I got the remittance from Bensberg."

It is, of course, apparent that the amount shown by the deposit tickets had been placed in the bank. Gibson is corroborated in his testimony as to the method of handling partial payments by the bookkeepers. An auditor testified that the audit showed that all moneys that were collected were eventually deposited in the Union Trust Company. It, therefore, conclusively appears that there was no embezzlement or misappropriation of the funds before they were deposited in the bank.

■ All funds having been deposited in the bank, what steps did the bank take for checking Gibson's transactions? Each month there was delivered by the Wholesalers' Service Corporation, to the assistant secretary of the bank, a list of payments on contracts pledged as collateral. The assistant secretary in turn took this list and checked it against the card record kept by the bookkeeper of the Voss-Hutton Company. Mr. Brizzolara, vice president of the bank, testified: "We attempted to control him in the collection of these accounts as he was to (account to) us on the 25th of each month for the collection made the previous thirty days, giving us a list of it, and when he made a payment on the note, he came down and gave us a list of the payments to be credited."

In the application for this bond appear the following question and answer: "Q. Are moneys to be paid into the bank by applicant? If so, how often will the bank book be inspected and checked? A. Yes. Account is checked each month."

As a matter of fact, the bank book or bank account was never checked or inspected, although the bank agreed to check and inspect the bank book. It in fact represented, first, that the bank book was inspected and checked each month, and, second, that the account was checked each month. In view of the relation of the parties, it seems clear that the bank agreed to check the bank account. It could hardly have been agreeing to check the account of some third person, as the only bank account in which the parties were interested was the bank account of Gibson.

In 3 Cooley's Briefs on Insurance, p. 2340, it is said: "The principle that a warranty must be complied with, irrespective of the materiality of the fact warranted, is also applied in the case of promissory warranties, and it may be stated as an established rule that, if a statement or promise relating to the future amounts to a warranty, the question of its materiality is eliminated, and the only concern of the court, in the absence of statutory provisions to the contrary, is to determine whether there has been a compliance or noncompliance with the rule."

No statutory provisions have been called to our attention which would modify this general principle. The statement was concerning what was to happen during the term of the insurance. It is in the nature of a condition precedent, compliance with which is essential to plaintiff's right of recovery. The provisions of the bond and applications made these statements warranties and not representations. Rice v. Fidelity & Deposit Co. (C. C. A. 8) 103 F. 427, 432; Lozano v. Palatine Ins. Co. (C. C. A. 5) 78 F. 278; Maryland Casualty Co. of Baltimore, Md., v. Bank of England (C. C. A. 8) 2 F.(2d) 793; Hunt v. Fidelity & Casualty Co. (C. C. A. 2) 99 F. 242; Imperial Fire Ins. Co. v. Coos County, 151 U. S. 452, 14 S. Ct. 379, 38 L. Ed. 231.

In Rice v. Fidelity & Deposit Co., supra, this court held that a promissory warranty was not a mere declaration of unexecuted intention. It is there said, inter alia: "A written statement made by employers to the obligor in a bond of indemnity against the dishonest acts of their employee to the effect that they will invariably apply certain checks to his action, which the parties expressly agree, by the statement itself and by the bond, shall be the basis of the latter, and a condition precedent to a recovery upon it, is of the nature of a warranty, and not of a representation, and a failure to comply with the promise it contains is fatal to an action upon the bond."

We need not consider what information might have been disclosed by a check and inspection of the bank records and bank account, or both. Had the bank inspected the bank account, it would have discovered at an early date the very acts of which it now complains. We are of the view that there was a breach of this promissory warranty which precludes the right of recovery on this bond.

It is also contended by appellant Employers' Liability Assurance Corporation that there was a breach of warranty in respect to the following questions and answers contained in the employer's statement.

"9A. At what date were his accounts examined last? A. December 31, 1930.

"B. Were they found correct in every respect? B. Yes.

"10. Is there any cash balance at present due to you from him? 'No.'"

There was a shortage or deficit on December 31, 1930, of $1,649.91. There was a cash balance due the bank at the time this application was presented of $2,673.15.

Without specifically reviewing the evidence, we are of the view that the answer with reference to whether the accounts were examined cannot be said to be false.

The lower court, while finding that there was a cash balance due from Gibson to plaintiff December 31, 1930, and April 13, 1931, found "that Gibson had so manipulated his books, juggled and concealed his actions, collections and disbursements that an examination of the books by a competent and experienced bookkeeper did not disclose the incorrectness of the books, nor did the records existing on April 13, 1931, disclose a cash balance due." It is urged by appellee that this finding of a balance due established a breach of warranty in the statement that there was no cash balance due the bank.

The answer to question 10 was false. There was a cash balance due the bank at that time of $2,673.15, and it is not conceivable that the surety company would have written this fidelity bond had this fact been disclosed. The finding that the books were manipulated, or that collections and disbursements were juggled and concealed, is not, we think, sustained by the evidence. The accountant who testified as a witness for appellee, and who audited the books of the Wholesalers' Service Corporation, said: "At the time we began the audit, the books were in what I would say was fair shape. I had to make some adjustments in it, the general ledger was in balance and some of the subsidiary accounts. I had to adjust the accounts receivable. I made some closing entries on the books and I have checked the controlling accounts of the accounts receivable against the accounts receivable ledger, and then I had some cards that I checked and there were some adjustments to be made. There were not a great many of them."

While the card records did not fully reveal all collections made, as we have observed, yet the money collected was in fact deposited in the bank and the question of disbursements would seem to be the important item.

When a fidelity bond is applied for, it is usual that information is sought as to whether the employee is in arrears or default, and a statement made in this regard is material and peculiarly within the knowledge of the employer, and if false will avoid the contract, irrespective of the intent of the applicant. 5 Cooley's Briefs on Insurance, p. 3903; Guarantee Co. v. First Natl. Bank, 95 Va. 480, 28 S. E. 909.

It follows that there has been a breach of these warranties, precluding a right to recover on the bond.

The judgment against Ray S. Gibson is affirmed; the judgment against the Employers' Liability Assurance Corporation, Limited, of London, England, is reversed, and the cause remanded, with directions to enter decree dismissing the suit as to said appellant.