**PADDLEFORD et al. v. FIDELITY & CAS-UALTY CO. OF NEW YORK.**

**SAME v. HARTFORD ACCIDENT & INDEMNITY CO.**

**Nos. 6439, 6440.**

Circuit Court of Appeals, Seventh Circuit.

Nov. 17, 1938.

Rehearing Denied Jan. 10, 1939.

Alfred M. Rogers and Miles G. Seeley, both of Chicago, Ill., for appellants.

J. F. Dammann, and Sidney K. Jackson, both of Chicago, Ill. (Wilson & McIlvaine, of Chicago, Ill., of counsel), for appellee Hartford Accident & Indemnity Co.

H. L. Howard and Wm. Greene, both of Chicago, Ill., for appellee Fidelity & Casualty Co. of New York.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

MAJOR, Circuit Judge.

This action was brought by the plaintiffs who were engaged in the general stock and grain brokerage business, to recover losses suffered by them through the dishonest acts of one of their employees, under Fidelity Bonds issued to plaintiffs by defendants, known as "Brokers' Basic Blanket Bonds," which bonds by their terms indemnified plaintiffs against any loss sustained "through any dishonest act of any of the employees, wherever committed and whether committed directly or by collusion with others." The bonds and endorsements of both defendants were standard forms of bonds and endorsements and were substantially identical.

The bond and endorsement of the Hartford Accident and Indemnity Company was in force from July 16, 1929 to July 16, 1931, and the bond of the Fidelity and Casualty Company of New York was in force from July 16, 1931 to November 15, 1931. The bond of the Hartford, for an annual premium consideration of $1452 undertakes to indemnify the assured as follows:

"Basic Form for Private Bankers and Stock Brokers.

"Standard Form No. 13.

" * * * to indemnify the Insured * * * against any loss, to an amount not exceeding Fifty Thousand & no/100 dollars, of money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, bills of lading, warehouse receipts, checks or other similar securities, * * * (all of such * * * being hereinafter referred to as Property), sustained by the Insured * * *."

Here follows in the original bond several provisions indicated as (A), (B) and (C) which were changed and amended by a rider simultaneously issued as follows:

"To be attached to Standard Form No. 13.

"Rider Extending Coverage of Insuring Clauses A, B and C.

"For Private Bankers and Stock Brokers.

" * * * In consideration of an annual additional premium, the Underwriter does hereby amend the above described bond, * * * as follows:

"First. By eliminating Insuring Clauses 'A,' 'B' and 'C' and substituting in lieu thereof, the following:

"(A) Through any dishonest act of any of the Employees wherever committed, and whether committed directly or by collusion with others."

Paragraphs (B) and (C) relate to losses resulting through larceny, theft, burglary,

etc. of property while in the assured's office or in transit under certain conditions and relate only incidentally, if at all, to the issues presented.

Following the enumerated items of coverage, there appears as follows:

"The foregoing agreement is subject to the following conditions and limitations:

"1. (Location of offices, etc., not in point.) ·

"2. This bond does not cover—

"(Thereupon follows a number of lettered clauses including clause (f), as follows.)

"(f) Any loss resulting directly or indirectly from trading, actual or fictitious, whether in the name of the Insured or otherwise, and whether or not within the knowledge of the Insured, and notwithstanding any act or omission on the part of any Employee in connection therewith, or with any account recording the same."

Both cases were submitted to the court on stipulation of facts and inasmuch as a determination of the issues presented depends to a large extent upon the character and nature of the business in which plaintiffs were engaged, as well as the acts and conduct of the employee respectively for the losses in question, we deem it appropriate to set forth a resume of such facts at greater length than would otherwise be necessary.

During all the time that the aforementioned bonds were in force and for a long time prior thereto, the plaintiffs were regularly engaged in buying and selling for customers, stocks, bonds and grains. The method of conducting these trades was as follows: A customer would place an order to buy or sell grain; the order would be noted on the records and telephoned to another employee located at the Board of Trade without disclosing the customer's name. The employee at the Board of Trade would turn over to a regular broker operating in "the pit" the execution of the order. The broker's execution of the order would be by agreement with some other broker in the pit, and as soon as executed, a report of that fact would be made back through the same channel to the plaintiffs' office; appropriate notations being made in the records of the Board of Trade and of the plaintiffs, including a record known as the "Street Option Book" where the recording was identified by the initials of the customer.

Thereupon the customer would be charged on the books with the trade and a con-firmation sent to him at the close of the day. If the order was a purchase, he would be charged the customary margin of several points and be asked for payment to that extent, if he did not already have credits on deposit with the plaintiffs.

The agreement on the Board of Trade through the brokers would include the kind and amount of grain, price, and the particular month during which the seller would be required to make, and the purchaser to take, delivery of the grain. The time of delivery was a matter of agreement with due reference to the season of the year, crop conditions, etc. The month selected might be immediately or as much as one year later. In addition to the confirmation given by the plaintiffs to the customer, the broker on the Board of Trade would confirm the agreement to the plaintiffs and the plaintiffs would issue a confirmation to the member of the Board of Trade with whom the broker had made the agreement. All of these transactions were handled under the rules of the Board of Trade and those using the Board of Trade as members were liable under the rules on the contracts made and the members in turn would hold their respective customers.

As a part of this procedure and under the rules of the Board, there was set up by the Board an organization known as the Board of Trade Clearing Corporation through which all trades were cleared daily. And at the end of each day the members, such as the plaintiffs, were required to pay to the Board of Trade Clearing Corporation funds to the extent of 2¢ for each bushel of grain purchased by customers over and above sales made for their customers. In addition, they were required to settle at the end of each day any fluctuation in market prices. All to the end that at the close of each day the plaintiffs and other members of the Board would not be indebted to the Board of Trade Clearing Corporation on account of any decline in the price of grain purchased by them and still have on deposit a margin of 2¢ for each bushel of grain carried overnight. As a part and parcel of this method of trading, all purchases and sales called for the making and acceptance of delivery by the customers through the members on the dates specified in the contract. In the event that a customer who had purchased grain would order a sale prior to the delivery date contracted for, the trade would be handled in the same way as set forth but with the re-

sult that it would be off-set against the purchase already referred to, and in turn the obligation on the new contract would be cleared through the Clearing House, so that the net result would be that delivery would be taken of only such purchases as had not been off-set by sales prior to delivery date.

Among the employees of plaintiffs during the years 1929, 1930 and until October, 1931, and for several years prior to the year 1929, was one Vincent E. Ciesler, who had charge of the grain records in plaintiffs' offices, in which records were recorded grain transactions handled by plaintiffs as brokers for their customers, and in which records were recorded the amounts owing from day to day by plaintiffs to the Board of Trade Clearing Corporation, or vice-versa, as the case might be. It was while thus employed that Ciesler carried on his scheme of defrauding the plaintiffs. Under his orders and directions many trades, regular and ordinary in appearance, but fictitious and fraudulent in fact, were put through the regular and ordinary channels of the business and consummated on the credit of plaintiffs. Without the knowledge or consent of the plaintiffs, Ciesler, commenced on August 7, 1930, and continuing up until October 31, 1931, telephoning to the plaintiffs' employee at the Board of Trade orders to buy and sell grain, although no customer had in fact given any such order. And when such orders were executed by the brokers on the Board and reported back, Ciesler did not write out any order or record the transaction by charging or crediting it to any customer, except that in each instance he entered it in the "Street Option Book," placing the initial of some customer opposite the entry for the purpose of deceiving the plaintiffs and making them believe the purchase or sale had been made for a customer.

At the end of each day Ciesler, in order to meet the liabilities of the plaintiffs to the Board of Trade Clearing Corporation, made out and presented to the plaintiffs for their signature, a check representing the amount owing by the plaintiffs on account of trading carried by them for their customers. On numerous occasions, as the situation required, Ciesler included in the amounts of such checks the sums required to satisfy the obligations incurred by reason of the fictitious trades transacted by the employees of the plaintiffs on the Board of Trade upon the order of Ciesler. In some instances these checks were signed by the plaintiffs in blank for the purpose of having Ciesler fill in the amounts owing by the plaintiffs to the Board of Trade Clearing Corporation. In some cases where losses were sustained on "completed trades" losses would be recorded in the "Commodity Difference Account" of the plaintiffs, kept by Ciesler, and no customer would be charged with the loss. The discrepancy resulting from the dishonest and unauthorized acts of Ciesler became apparent as soon as open trades came into liquidation. Certified Public Accountants were employed by plaintiffs, and Ciesler, realizing his fraudulent acts were about to be discovered, absconded.

From this audit of the plaintiffs' books, particularly of the records of the trades conducted by the plaintiffs on the Board of Trade, including the fictitious trades of Ciesler, the loss here sued for was set up by the Auditors. Ciesler returned and assisted in making the audit. The report points out in detail the course pursued by Ciesler in the furtherance of the scheme by which he was enabled to defraud plaintiffs.

The contested issue or issues must be determined upon the construction to be given to the bonds and endorsements sued upon. It is the contention of the plaintiffs that they are entitled to recover under the provision insuring plaintiffs against loss "through any dishonest act of any of the employees, wherever committed and whether committed directly or by collusion with others," while defendants contend they are not liable by reason of sub-section (f) of Section 2 of the bonds (heretofore set forth). Plaintiffs respond to defendants' contention by asserting that sub-section (f) is not a limitation upon the insuring provision and that it reasonably can be construed as placing a limitation upon the acts of an employee other than those which are designated as dishonest. Plaintiffs also contend that sub-section (f) has no application for the reason that the loss sustained was not the result of "directly or indirectly from trading, actual or fictitious." Another contention made by defendants is that the loss was not "of property" as defined in the policy.

A vast number of authorities are cited by plaintiffs, many of them quoted from, in support of the doctrine of strict construction applicable to insurance policies, based on the fact that insurance policies are usually drawn by the insurance com-

pany and that they must, in the event of ambiguity, be construed against the company. On the other hand many cases are cited and quoted from by defendants in support of the rule that contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if such terms are clear and unambiguous, are to be so construed and enforced. Each of these rules is so firmly established in our jurisprudence as not to require the citation of authority in support thereof. It would, therefore, serve no useful purpose for us to undertake to analyze and comment upon such cases and we shall confine ourselves to those which may have some special significance in relation to the precise issues with which we are here confronted.

Before entering into a discussion of the issues, it is of some significance, we think, to relate that the case in which the Fidelity and Casualty Company was defendant was originally assigned to the Honorable John P. Barnes, Judge of the District Court, and that the case in which Hartford Accident and Indemnity Company is defendant was assigned to the Honorable Charles E. Woodward, Judge of the District Court. The former Judge, in the case before him, overruled a demurrer filed by the defendant and the record discloses that the brief filed in support of said demurrer raised the question that there could be no recovery because of the limitation contained in sub-section (f). Afterwards, the case before Judge Barnes was assigned to Judge Woodward, where the causes were consolidated for hearing with the resulting decision in favor of defendants.

We shall first consider plaintiffs' contention that a recovery may be had irrespective of the construction which is placed upon sub-section (f) of Section 2 of the conditions of the bonds. In other words, it is asserted that the type of loss here involved was not a trading transaction within the meaning of said sub-section. In support of this position, great stress is laid upon the case of In re Schluter, Green & Co., 4 Cir., 93 F.2d 810, which opinion was rendered subsequent to the trial and decision of these cases in the lower court. How plaintiffs can find so much satisfaction in this case is more than we can understand. While the court permitted a recovery in this case, it seems to us that what the court said is against plaintiffs' contention now under discussion. True, the language

in the insuring clause of the bond sued on, as well as the excepting clause, was identical with those here involved. In that case, however, the dishonest acts of the employee were conducted by her through an outside broker, and her employer was not involved in the trades made by her. When the employee needed further margins to cover the market shrinkings, she appropriated money from her employer's bank account. There is nothing in the reported opinion to indicate that the trading was done through the employer corporation or on its credit. There was nothing whatever on the books of the insured with reference to the trading transactions. The trading was between the defaulting employee and an outside brokerage concern, with which the employer had nothing to do. On page 813 it is said:

"It does not appear that the credit of the company was pledged or that it was involved in the business in any way. Some of the securities purchased declined in value and, when additional margins were called for, Miss Seay drew various sums, amounting in the aggregate to $4,520, from the company's bank account and used them to meet the demands. Manifestly the company suffered a loss in these matters as a result of the dishonest or criminal conduct of its employee and the surety would be liable unless the company was in fact involved in the business and the loss was excepted from the coverage of the bond by section 2 (j) as one suffered directly or indirectly from trading, in the manner hereinafter set forth."

As to whether the losses come within the limitation of the "trading clause" is made to depend, according to this opinion, not on the question as to whether the employer has suffered a loss, but whether it has incurred legal responsibility on account of the acts of its employee, and it was held because no legal responsibility devolved upon the employer, that the "trading clause" was not applicable and the court did not undertake to construe it.

█ In the case at bar, the facts are quite different from what they were in the Schluter Case. Here Ciesler was the manager of the plaintiffs' grain department and was their duly authorized agent to make trades for customers. He had charge of the records in which were recorded all of such trades as were handled by the plaintiffs as brokers for their customers and he had charge of all the records and transactions

in connection with trades between plaintiffs' brokers on the Board of Trade and the Board of Trade Clearing Corporation. In the execution of the scheme employed by him, he made use of the regular trade procedure. The plaintiffs were involved in the business, their credit was pledged and they were unquestionably liable for losses thus sustained. The various parts of plaintiffs' mechanism for the conduct of their business were utilized by Ciesler in the execution of his fraudulent and dishonest transactions, the same as were used in the conduct of plaintiffs' lawful business. That the losses sustained come within sub-section (f) of said Section 2 can not be doubted. They were the result of Ciesler's trading activities and while fraudulent and fictitious and unknown to the plaintiffs, were the result of trading within the scope of his employment and for which plaintiffs were responsible. A reading of the bill of particulars furnished by the plaintiffs, as well as the stipulation of facts upon which the case was tried, leaves no doubt on this point.

■■ Holding as we must that sub-section (f) of Section 2 is applicable, this brings us to the point where we must construe its language in connection with the provision found in the rider by which the plaintiffs were indemnified against losses "through any dishonest act of any of the employees wherever committed, and whether committed directly or by collusion with others." Defendants insist, and the court below so held, that the language contained in this limitation is plain and unambiguous and is therefore a bar to plaintiffs' suit, while plaintiffs insist that even though the acts of Ciesler come within this trading clause, it should, notwithstanding, be permitted to recover on the grounds that a proper construction of the two clauses must reveal that there was no intention on the part of the parties to so limit losses resulting from the "dishonest acts" of an employee. In determining the matter of the intention of the parties, plaintiffs propose that the court examine their application for the policy in suit. Defendants argue that inasmuch as the application is not made a part of the contract, it has no bearing and should not be considered. Among the cases cited to sustain plaintiffs' theory is that of Employers'

Liability Assurance Corp. v. Wasson, 8 Cir., 75 F.2d 749. So far as the opinion in that case discloses, the application was not made a part of the bond, but was considered by the court in ascertaining the intention of the parties to the insurance contract. From a reading of the cases cited by defendants,[1] we do not believe there is any rule which precludes a court from an examination and consideration of the application for the purpose of determining the intention of the parties and this, irrespective of whether or not the application is a part of the contract. Of course, there can be no recovery based upon such application, nor does it afford a defense and that is what the cases generally hold. In Transcontinental Insurance Co. v. Stanton, supra, relied upon by defendants, the matter which the court was considering was whether or not false representations made in the application voided the insurance where the application was not made a part of the policy. This court, on page 937 said:

"The policy itself makes no reference to any application, and there is nothing therein which purports to make an application or any other writing a part of it. The policy constitutes the entire contract. Representations of facts concerning the insurance contained in other writings to which the policy makes no reference can, in case they are untrue, affect the policy only to the extent that they are material."

There is nothing in this opinion inconsistent with the right of the court to consider the application insofar as it may throw light on the intentions of the parties, especially where it is claimed, as here, that there is ambiguity in the terms of the contract.

The following questions and answers, among others, appear in the application:

"6. Do you operate a quotation board? Yes.

"7. Approximate number of margin accounts. 300.

"8. (a) What employee or employees keep the margin record? (a) Edmund J. Brennan.

"(b) How often and to what extent does any member of the firm verify sufficiency of margins? (b) Approximately every week.

[1] Maryland Casualty Co. v. Robertson, Tex.Civ.App., 194 S.W. 1140, 1144; Transcontinental Insurance Co. v. Stanton, 7 Cir., 74 F.2d 935, 937; New York Life Insurance Co. v. Tolbert, 10 Cir., 55 F.2d 10, 12; Spence v. Central Accident Insurance Co., 236 Ill. 444, 449, 86 N.E. 104, 19 L.R.A.,N.S., 88; Mutual Life Insurance Co. v. Allen, 212 Ill. 134, 139, 72 N.E. 200.

"9. (a) Who sends out the daily and monthly statements to customers? (a) Bookkeeper, Ernest Trier.

"(b) Under whose supervision? (b) A. T. Cuny.

"(c) How and to what extent does supervisor verify actual sending out of statements? (c) No actual monthly verification but every six months all sending of statements are verified by A. T. Cuny or auditors.

"(d) Do those who send out these statements have anything to do with receiving or placing orders or keeping the margin records? (d) No."

Plaintiffs argue, and we think with some logic, that if the bond was not intended to indemnify the plaintiffs against losses incurred through the dishonest acts of its employee, even though connected with a trading transaction, that the defendants could have had no purpose in requiring the information found in the answers above set forth. It would seem that such information was unnecessary, if not useless, unless the defendants construed their bonds to indemnify the plaintiffs against loss through a dishonest act of an employee, even though such dishonest act was in some way connected with a trading transaction. While we do not attach the importance to this circumstance which plaintiffs would have us do, yet we think it has a tendency to sustain plaintiffs' theory with reference to the construction which should be adopted.

We have urged upon us that a construction of the trading clause and the question as to whether it constitutes a defense in a case of this character, are questions of local law and must be governed by the decisions of the Illinois Court.[2]

The case cited and relied upon by plaintiffs as determining the local law of Illinois is that of American Investment Company v. U. S. Fidelity & Guaranty Company, 267 Ill.App. 370. Defendants' position is that this decision does not determine the local law inasmuch as it is by an intermediate Appellate Court and not by the highest court of the state. We are of the opinion that it is not necessary for us to pass upon this point for the reason that a careful examination of this decision convinces us that it is not determinative of the question here involved. It is true that the bond sued upon

and the trading clause relied upon by the insurer were practically identical with the bond and trading clause before us. The court held that while the loss sustained was the result of the dishonest acts of the employee, that the latter within the facts of that case, did not come within the trading clause relied upon as a defense. It said on page 389: "It is also contended that no recovery can be had because the bond provides that appellant is not responsible for any loss resulting directly or indirectly from trading actual or fictitious, whether in the name of the insured or otherwise. The word 'trading' ordinarily implies a purchase and sale. In this case nothing was bought and nothing was sold by Burch nor his co-conspirators. It is admitted in the stipulation of facts that appellees did not buy these securities for the purpose of selling the same and did not sell them but simply purchased them for an investment."

Following its conclusion that the defaulting employee did not come within the limitation with respect to "trading," the court, in discussing the provision, used some language, which while favorable to plaintiffs' contention that the trading clause should not bar a recovery, must be regarded as unnecessary in the decision of that case. It said, page 390:

"If this rider should be given the construction sought to be placed upon it by appellant, then it would practically annul all the provisions therein for the protection of the assured. * * *

"The bond itself states that appellant agrees to indemnify appellees in the loss of money or securities or both in which the insured has a pecuniary interest in an amount not exceeding $25,000 through any dishonest act of any of the employees, as defined at section 6 thereof, whether acting alone or in collusion with others. Where two provisions in an insurance policy or bond are antagonistic and inconsistent with each other, that provision will be enforced which favors the protection of the insured."

It will thus be seen that the court actually decided the case on the same grounds announced by the court In re Schluter Green & Co., supra; that is, that the employee did not come within the terms of the "trading clause" and that this clause, therefore, could not be relied upon by the

[2] Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290.

defendant. Therefore, even if it be conceded that the local law may be determined by the decision of an intermediate court, and this we do not decide, this decision does not decide the question before us.

Defendants, in support of their theory that sub-section (f) is a bar to recovery, cite and rely upon a number of cases which are found in the footnote.[3] We have read these cases and find in them support for defendants' position, although not to the extent urged. While we give respectful consideration to the views expressed by other courts, yet the construction which should be placed upon the controverted provisions of the bond in question is our responsibility. Here, as often, the cases cited and relied upon by opposing parties are based upon dissimilar facts with different questions raised, which leads to what appears to be conflicting opinions.

We reach the conclusion that the language of the bonds which indemnified the plaintiffs against any loss incurred "through any dishonest act of any of the employees, wherever committed and whether committed directly or by collusion with others" was intended to and did indemnify the plaintiffs against the very type of loss which they sustained in this case and that the language of sub-section (f) was not intended to exclude coverage of any loss incurred through a "dishonest act." We think this construction does no violence to the language of sub-section (f) and does not render it nugatory as claimed by the defendants. It is reasonable to conclude that it was intended, not as a limitation upon losses sustained through the dishonest act of an employee, but rather upon those which were not dishonest, and we apprehend, in a business of this character, there are many losses the result of acts other than those dishonest. For instance, trading losses incurred by plaintiffs through their own trading or through trading by customers who fail to meet their commitments, or because of mistakes made in filing orders for customers, or for negligence in failing to insist that the accounts of customers be properly margined, or errors of employees in recording trades, or in failure to notify customers of purchases or sales, or numerous other types of losses which brokers, no doubt, suffer on account of trades which are not the result of the dishonesty of an employee. This construction, we think, is reasonable, in view of the nature and character of the business in which plaintiffs were engaged. To us it borders on the preposterous to say that it was the intention of the parties to indemnify plaintiffs against the loss occasioned by a dishonest employee and at the same time make this indemnity unavailing if the loss was occasioned while engaged in trading, the precise business in which plaintiffs were engaged as defendants well knew. It is not consistent with our sense of justice to say that either of the parties intended that the plaintiffs in one breath should be given protection, and in the next, taken away. It would be just as logical to insure an employer against liability incurred because of an injury to an employee and then limit the protection so that it would not apply in case the employee was injured in the course of his employment, or to insure a bank against the dishonest act of its employees and then limit the protection so as to make it nugatory if the bank sustained a loss while the employee was behind the cashier's window. If this contract was not for the purpose of protecting the assured from the dishonest acts of its employees, committed in the usual course of its business, it is difficult to comprehend what purpose it served. Surely it did not furnish coverage for dishonest acts occurring in some business other than that in which plaintiffs were engaged. Defendants argue that this construction nullifies sub-section (f); that there was no occasion to place a limitation upon acts other than those dishonest as they were not covered by the insuring clause. Even if this argument be tenable, there are equal grounds for concluding that defendants' construction would nullify the insuring clause and would reduce the protection afforded by its bond to a mere shadow, irrespective of the fact it was paid a rather substantial consideration. Notwithstanding defendants' contention that the language of the limitation clause is plain and unambiguous, one District Court held the provision did not constitute a defense, and a reading of the cases heretofore referred to indicates that it has been the occasion for doubt and confusion. We think there is sufficient doubt as to its mean-

---

[3] Harris v. National Surety Co., 258 Mass. 353, 155 N.E. 10; Earl v. Fidelity & Deposit Co., 138 Cal.App. 435, 32 P.2d 409; Rath v. Indemnity Ins. Co., 2 Cal.App.2d 637, 38 P.2d 435; Kean et al. v. Maryland Casualty Company, 221 App. Div. 184, 223 N.Y.S. 373.

**614**

ing to bring into force the rule so often an-announced, that a construction. should be had, if possible, which will effectuate the insurance and not defeat it.[4]

■■■ Defendants also urge there can be no recovery for the reason that the loss was not of "property" covered by the bonds. The bond insures against any loss to an amount not exceeding $50,000 of "money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, bills of lading, warehouse receipts, checks or other similar securities in which the insured has a pecuniary interest." The bond describes "money" to mean "currency coin bank notes, bullion and uncancelled United States postage and Revenue stamps." It is argued that the loss sustained was not money but merely a depletion of plaintiffs' credit with their bank. So far as the record discloses, no such question was raised in the court below; in fact, it appears rather certain it was not raised. The complaint alleges the loss to be the result of the "wrongfully using of funds belonging to plaintiffs." The bill of particulars describing plaintiffs' claim sets forth in some detail the manner and method by which plaintiffs sustained their loss. Defendants, to such complaint, filed three pleas and nowhere is such a defense interposed. In Degener v. Hartford Accident & Indemnity Company, 3 Cir., 92 F.2d 959, relied upon by defendants, it will be noted that such a defense was interposed. In that case, while the court held, or at least used language to the effect, that credit balances based on deposits did not come within the term "money" as defined in the bond, yet it appears that the decision was based largely upon the fact that the property, the loss of which was claimed, was not upon the premises of the insured or in any recognized place of safe deposit as was required by the bond. The court on page 961 says: "A bank credit, or a credit with an agent or broker, has no localization." No such situation is here presented. The insuring clause here relied upon protects the assured against the dishonest act of the employee wherever committed. It seems to be defendants' position that the property protected was only that which was tangible. Such a construction could not be justified either

by logic or common sense. It ignores the many kinds of property described other than money, including "checks or other similar securities." A check, for instance, while tangible property, has, in itself, only a nominal value. There could be no loss sustained by reason of the dishonest act of an employee in procuring a check unless the proceeds of the checks were realized. If the employee had obtained a check through some dishonest act, presented it to the bank and obtained the proceeds thereon, it perhaps would not be contended but what plaintiffs' loss would have "been property" within the term of the bond. In the instant case, checks were obtained legally and the amounts filled in for more than was authorized. In effect, the dishonest acts amounted to forgery. Sub-section (a) of Paragraph 2 recognizes that a· loss resulting from forgery under the circumstances there defined, is a recoverable one. Irrespective of whether the term "money," as that term is defined in the bond, is sufficient to cover plaintiffs' loss, we are of the opinion that the word "checks" is sufficiently broad to include a loss sustained by their improper and unauthorized use which directly resulted in the depletion of plaintiffs' bank account.

■■■ As a part of the stipulation of facts entered preceding the trial in the court below, certain formulas were submitted by which the amount of plaintiffs' damages against the Hartford Accident and Indemnity Company were to be determined in the event the issues were decided in favor of the plaintiffs. In the same stipulation it was agreed as to the amount of plaintiffs' damages against the Fidelity and Casualty Company of New York, likewise in the event the issues were decided in favor of the plaintiffs. We are asked to determine which of the formulas proposed is the one to be applied in determining the amount of plaintiffs' damages. This matter evidently received no consideration by the court below and we do not think it should be determined by us in the first instance.

The causes are reversed with directions to the court below to determine plaintiffs' damages in accordance with the stipulation entered and to render judgment accordingly.

---

[4] Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; Thompson v. Phenix Ins. Co., 136 U.S. 287, 10 S.Ct. 1019, 34 L.Ed. 408; American Surety Co. v. Pauly, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977; Royal Exchange Assurance of London v. Thrower, 5 Cir., 246 F. 768; Rushing v. Manhattan Life Ins. Co., 8 Cir., 224 F. 74.