**ROTH v. MARYLAND CAS. CO.**
Civ. A. No. 8915.

United States District Court
E. D. Pennsylvania.
July 13, 1953.

tical bonds of indemnity (hereinafter referred to as "the bond"), to recover losses sustained by him as a result of certain dishonest and unauthorized acts of one of his employees.

The losses were incurred while plaintiff, Sydney Roth, was engaged in business in Allentown, Pennsylvania, as a licensed dealer in securities trading under the name of "Roth & Company". At all pertinent times plaintiff was covered by the bond, known as a "broker's blanket bond", issued to him by defendant, and the coverage exceeded the total amount of losses here claimed.

In 1946 and 1947, Harry L. Fletcher, while employed as plaintiff's office manager, in connection with his employment committed a number of wrongful and unauthorized acts resulting in losses, which were first discovered by Roth on November 10, 1947. Defendant, Maryland Casualty Company, has admitted its liability as to several of the claimed losses and has paid them, but has denied liability as to the bulk of plaintiff's claims, which are based on a series of losses incurred as a result of Fletcher's manipulation of a certain account described below. Whether the bond covers this group of losses is the principal question in the case. .

The losses in question arose under the following circumstances. On a number of occasions in 1946 and 1947, Fletcher, without authority and without the knowledge of plaintiff, bought and sold in plaintiff's trade name, Roth & Company, various stocks and bonds through a certain account which, at the trial, was referred to as the "mark-up account" by Roth and the "trading account" by Fletcher. What it is called is immaterial, for there is no dispute as to what Fletcher was authorized to do and what he actually did do through the account.

Fletcher's only authority in connection with the account was to buy and sell securities for customers on written orders from the customers themselves or from Roth or his salesmen on behalf of customers. For the sole purpose of filling customers' orders Fletcher was authorized to buy and sell securities in this account in

Francis J. McCarthy, Philadelphia, Pa., for plaintiff.

Swartz, Campbell & Henry, Philadelphia, Pa., for defendant.

GRIM, District Judge.

This is an action by a securities broker upon two successive and substantially iden-

the name of Roth & Company itself as principal. These securities were to be bought from or sold to the ordering customer at a discount or mark-up of an eighth or a quarter of a point, which represented plaintiff's only profit on the transaction. Under his employment contract with plaintiff, Fletcher was to receive 20% and plaintiff was to receive 80% of the net profits realized from this "mark-up account" or "trading account" at the end of each year.

Although Roth had not authorized Fletcher to use this account as a trading account (that is, an account for the buying and selling of securities for the purpose of realizing gains from fluctuations in the securities markets), Fletcher without plaintiff's knowledge had in fact traded by using the account from the time it was set up in 1942 until the time the losses now in question were discovered in 1947. Fletcher's scheme was to reap 20% of the account's annual capital gains profits in addition to the legitimate mark-up profits. Until 1946 his scheme had worked successfully, with the account each year showing a profit of which Fletcher pocketed 20%. But in 1946 and 1947 Fletcher's unauthorized trading (perhaps "speculation" is a more accurate word) went awry, most of the securities he purchased dropped in value, and the account sustained losses disclosed for the first time by an audit in November of 1947.

The securities traded in the account cleared through and were kept in the possession of the Trust Company of North America, which was plaintiff's correspondent bank in New York City. When Roth learned of the dishonest scheme on November 10, 1947, many of the wrongfully purchased securities were still in the possession of the Trust Company of North America. They were disposed of the following week at a loss of $8,588.86, which constitutes the bulk of the losses, totalling $11,918.13, claimed on the bond.

The insuring clause of the bond provides as follows:

"Section 1.—The Maryland Casualty Company * * * agrees to indemnify Sydney Roth * * * T/A Roth & Company, Allentown, Pa. * * * against the direct loss of any Property * * * sustained * * * as follows:

"(A)—Through any dishonest act hereafter committed, of any of the Employees, as defined in Section 6 hereof, whether acting alone or in collusion with others."

The excluding clause of the bond on which the defendant relies in disclaiming liability provides as follows:

"Section 7.—This bond does not cover:

* * * * * *

"(f)—Any loss resulting directly or indirectly from trading with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance."

There is no doubt that Fletcher's unauthorized transactions were "dishonest acts" within the scope of Section 1(A) of the bond. It is equally clear that these dishonest acts constituted "trading" and that the losses resulting therefrom are explicitly excluded from Section 1(A)'s coverage by Section 7(f) of the bond.

Plaintiff vigorously contends that the language of subsection (f) was not intended to exclude coverage of any loss incurred through a "dishonest act". But (f) excludes from coverage "any loss", "notwithstanding any act or omission on the part of any Employee in connection with any account" relating to "trading with or without the knowledge of Insured, in the name of the insured or otherwise". (Emphasis supplied.) Subsection (f) clearly excludes all trading losses, whether resulting from honest or dishonest acts.

Plaintiff predicates his right to recovery largely upon the authority of the case of Paddleford v. Fidelity & Casualty Co. of New York, 7 Cir., 1939, 100 F.2d 606.

Unquestionably the holding in that case supports plaintiff's contention that the trading loss exclusion in the bond (which appears to be substantially the same form of bond involved in the Paddleford case) does not apply to trading losses incurred through dishonest acts. Defendant on the other hand relies, among other authorities, on the opinion of the Court of Appeals for the Third Circuit in Degener v. Hartford Accident & Indemnity Co., 1937, 92 F.2d 959, which involved a bond substantially the same as the bond now in question. In the Degener opinion there appear quoted statements to the effect that the trading loss exclusion in a "broker's blanket bond" is applicable to trading losses incurred through dishonest acts.. The statements are quoted from, and constitute the holding in, the opinion of the court below. Although the Court of Appeals did not explicitly approve the lower court's holding, it is evident that both the late Judge Buffington, who wrote the majority opinion, and Judge Biggs, who wrote the dissent, assumed the correctness of the quoted holding and in effect adopted and treated it as their own dictum. It seems, therefore, that in the opinion of the Court of Appeals for the Third Circuit the exclusion clause is applicable to the type of situation which appears in the present case, and that the law in this Circuit is not in accord with the decision in the Paddleford case.

The Paddleford decision apparently stands alone. The California and Massachusetts state courts, in cases involving broker's indemnity bonds substantially identical to the bond now in question, have held that dishonest trading losses are excluded from coverage. In Rath v. Indemnity Ins. Co. of North America, 1934, 2 Cal.App.2d 637, 38 P.2d 435, a securities broker's employee, without authority, entered an order on a customer's account and a loss resulted. The California District Court of Appeal, holding that the broker could not recover on the "broker's blanket bond", stated, 38 P.2d at page 436:

"Under the terms of the exonerating provision of the bond, it is immaterial whether the loss in a trading transaction was occasioned by the dishonest act of an employee or not. The very language and its place in the contract carry conviction that the exonerating clause limited the dishonesty clause, and has the effect of relieving the surety from liability for any dishonest act of an employee committed in a trading transaction resulting in loss."

In Harris v. National Surety Co., 1927, 258 Mass. 353, 155 N.E. 10, a broker's cashier maintained a trading account in the name of his mother-in-law. This was a fictitious account because the cashier and not his mother-in-law was its real owner. After the broker, still unaware that the account was fictitious, discovered that the account was short about $4,000, the cashier persuaded him to let the account remain by falsely representing that his mother-in-law was a woman of means. When the fraudulent scheme was uncovered and the account closed, plaintiff-broker had sustained a loss of about $7,000. The Supreme Judicial Court of Massachusetts overruled plaintiff's contention that the word "trading" in the bond was limited to trading for the firm by an employee known as a "trader", held that the word "trading" applied to the transactions involved in the fictitious mother-in-law's account, and denied recovery on the ground that the trading loss exclusion in defendant surety company's bond limited the clause insuring against losses from dishonest acts of employees.

The facts in both the Rath and Harris cases are closely analogous to those in the present case. The Rath case, like the present case, involved the misuse of a legitimate account for a fraudulent purpose. The Harris case involved the misuse of a fictitious account for a fraudulent purpose. In all three cases the fraudulent purpose of the dishonest employee was to trade or "play the market" for his own profit by the unauthorized and dishonest use of the funds and credits of the broker-employer.

On the basis of my own independent conclusion, supported by the authorities cited above, I hold that plaintiff is not entitled to recover for losses incurred in 1946 and 1947 as a result of Fletcher's dishonest trading in the account in question

■ One minor question remains. On February 25, 1946, Fletcher entered in the records of plaintiff an order for 1000 shares of Gaspe Oil Ventures stock for the account of his wife, Gertrude L. Fletcher, at 45 cents a share, or a total price of $450. He secreted in plaintiff's files a check for $450 drawn to the order of Roth & Company and signed by himself and his wife. Fletcher concealed this transaction from plaintiff. At no time during the transaction did Fletcher or his wife have sufficient funds on deposit to cover the check, and it was never deposited for collection. Although Fletcher and his wife never paid for the 1000 shares of Gaspe stock, Fletcher obtained possession of the stock certificates and removed them from plaintiff's office. This dishonest act, like the other dishonest acts of Fletcher, was discovered on November 10, 1947. On November 8, 1947, the business day next preceding discovery of their loss, the value of 1000 shares of Gaspe stock was $640.

Defendant contends that if it is liable for this loss, plaintiff's damages amount to only $450. Plaintiff on the other hand claims $640 in damages, basing his claim on Section 9 of the bond, which provides: "The value of any securities for which claim may be made hereunder shall be determined by the average market value of such securities on the day before the discovery of their loss."

Plaintiff contends that, for purposes of analysis, the Gaspe stock transaction should be divided into two phases, the first phase being the embezzlement and misappropriation of $450 of plaintiff's funds. He argues that, since the stock had been ordered through the plaintiff with his money and credit used to pay for it, the stock belonged to plaintiff at the time of its removal from the office, and that its removal, the second phase of the transaction, was the final and crucial dishonest act, which resulted in a loss of securities within the meaning of Section 9 of the bond. Therefore, he contends the loss should be measured by the value of the securities on the last business day before discovery of their loss.

In my opinion, plaintiff's contention is without merit. Roth & Company sustained not a loss of securities but a loss of credits which Fletcher had misappropriated to his own use. It is true that Fletcher obtained property (namely, the Gaspe stock certificates) under false pretenses (by passing a worthless check), but he obtained the certificates *through* and *not from* Roth & Company. What Fletcher wrongfully obtained *from* Roth & Company was the use of its credits in the amount of $450 to purchase the stock. Fletcher's misappropriation of plaintiff's credits obviously did not result in a trading loss, for the stock had actually risen in value; but, unfortunately for plaintiff, the certificates were no longer available to him when the fraudulent transaction was discovered. With respect to measuring his loss, plaintiff was damaged by Fletcher's misuse of the firm's credit to exactly the same extent that he would have been damaged if Fletcher had embezzled $450 of the firm's cash and had used it to purchase the Gaspe stock (through Roth & Company or through any other broker). I hold, therefore, that plaintiff is entitled to recover $450 under the bond for his loss in connection with the Gaspe stock transaction.

Judgment will be entered in favor of plaintiff and against defendant in the amount of $450, with interest thereon from November 10, 1947.

The statements of fact and law in the foregoing opinion will constitute the Court's findings of fact and conclusions of law in the case.