## DEGENER et al. v. HARTFORD ACCIDENT & INDEMNITY CO.

No. 6364.

Circuit Court of Appeals, Third Circuit.

Oct. 14, 1937.

Rehearing Denied Nov. 30, 1937.

John E. Evans, Sr., John E. Evans, Jr., and Margiotti, Pugliese, Evans & Buckley, Linus P. McGuiness, and John M. Gallagher, all of Pittsburgh, Pa., for appellant.

Gifford K. Wright, of Pittsburgh, Pa. (Alter, Wright & Barron, of Pittsburgh, Pa., of counsel), for appellee.

Before BUFFINGTON and BIGGS, Circuit Judges, and DICKINSON, District Judge.

BUFFINGTON, Circuit Judge.

In a state court, Chaplin & Co. brought suit against the defendant insurance company to recover damages sustained by it for which defendant, as alleged, was liable on its indemnity bond given to the plaintiff. No facts being in dispute, the case was heard by the court on the plaintiff's motion for judgment for want, as was alleged, of a sufficient affidavit of defense. After hearing, the court, in an opinion[1] entered judgment for the defendant. Whereupon plaintiff took this appeal.

The pleaded pertinent facts are that plaintiff, a stock brokerage firm, was requested by the Sterling Investment Corporation (hereafter called Sterling) to buy for it 100 shares of Le Moyne Steel Company stock at $140.50 per share, which the plaintiff did. Plaintiff alleged in its pleadings that, with the intent to defraud it, Sterling made false statements to plaintiff to induce it to buy said stock, inter alia, that such stock was being purchased "in the course of a bona fide sale from a third party," and that "said stock ·had a market value of approximately the suggested purchase price for said stock," and that "for the purpose of defrauding the plaintiffs, Sterling created a fictitious market value for said Le Moyne Steel Company stock, by making false sales and false purchases of the stock of said Company," and which procedure is known as "wash sale," when in fact Sterling "well knew the said Le Moyne Steel Company stock was worthless and without value." It was further alleged that "at or about the same time that Sterling Investment Corporation gave to its New York agent the said order to sell the said LeMoyne Steel Company stock, it gave to plaintiff orders to buy the same stock." It was further alleged: "That relying upon the said false statements and fraudulent acts made by and for the Sterling Investment Corporation and being falsely induced by them, the plaintiff at its office in Pittsburgh, ordered its New York office to purchase in New York City, the said two hundred (200) shares of stock at the prices fixed by the agent of the

---

Sterling Investment Corporation with plaintiffs." It was further alleged, that "certificates for the said two hundred (200) shares of Le Moyne Steel Company stock were received from the Sterling Investment Corporation's New York Agent by Plaintiffs' Agent, the former forwarding the said money in the sum of $28,150.00, to the Sterling Investment Corporation," and that "the said Sterling Investment Corporation received the said money of the plaintiffs in the sum of $28,150.00 which it had thus fraudulently obtained from the premises of the plaintiff and from the plaintiff's bankers and recognized place of safe deposit."

In accord with the above allegations, plaintiff, on the discovery of the alleged fraud some four months thereafter, thus summarized its claim in the notice and proofs of loss furnished to defendant:

"On the 9th day of January, 1935, a loss was sustained by us through fraudulent means amounting to $24,003.34. The circumstances were as follows:

On the aforesaid date of January 9, 1935, the Sterling Investment Company, Pittsburgh, Pennsylvania by fraudulent means caused the loss to J. H. Holmes & Company in the sum of $24,003.34 by false and malicious representation as to the transactions involving the ownership of and value of 200 shares LeMoyne Steel Company Stock."

On its part defendant in its affidavit of defense alleged, inter alia: "The bond sued upon provides that it does not cover 'any loss resulting directly or indirectly from trading, actual or fictitious, whether in the name of the Insured or otherwise, and whether or not within the knowledge of the Insured.' The loss which it is alleged the plaintiffs suffered was a loss resulting directly from trading."

Referring to this defense that the transaction was a trading loss, the court below, so holding, said:

"This bond does not cover * * *

"(f) Any loss resulting directly or indirectly from trading, actual or fictitious, whether in the name of the Insured or otherwise, and whether or not within the knowledge of the Insured, and notwithstanding any act or omission on the part of any employee in connection therewith, or with any account recording the same.'

"If that portion of the statement relating to the stock transactions of plaintiffs with the Sterling Investment Corporation is to be considered other than as surplusage, the pleading discloses just such a loss as is contemplated by the paragraph quoted. The word 'trading,' as used, means the operation of the usual occupation of buying and selling stocks. In this connection it must not be forgotten that a stockbroker differs from the ordinary broker who is merely a conduit between buyer and seller. The stockbroker buys the stock with his own money, thereby becoming a creditor of the buyer as well as a trustee of the stock. The loss of plaintiffs resulted from trading—a fictitious trading and without the knowledge of the insured, it is true, but still the trading contemplated by the bond."

But for present purposes assuming, but only assuming, that the transaction was not a trading loss, defendant alleges another defense; namely, that the transaction, whatever it was, was not one covered by the bond.

Now the bond indemnifies against loss, as stated by the court below, of "money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, bills of lading, warehouse receipts, checks or other similar securities, in which the insured has a pecuniary interest. * * *

"(B) Through larceny, whether common-law or statutory, robbery, burglary, holdup, theft, or other fraudulent means * * * while the property is within any of the Insured's Offices covered hereunder, or upon the premises of the Insured's Bankers in the United States or in any recognized place of safe deposit in the United States. *· * *"

The plaintiff's contention is that the loss was a loss of money, and that such money loss was caused by "fraudulent means." But while the plaintiff lost money in the transaction and Sterling brought about such money loss by "fraudulent means," the question still remains what the policy stipulated as the money whose loss the policy indemnified against and the location of that particular money. The policy provided: "The term 'Money' as used in this bond shall be deemed to mean currency, coin, bank notes (signed and unsigned), bullion, and uncanceled United States postage and revenue stamps."

Likewise, the policy provided that the actual money whose loss was indemni-

fied against was money "lost * * * while the property is within any of the insured's offices covered hereunder or upon the premises of the insured's bankers in the United States or in any recognized place of safe deposit in the United States". The term here used is not mere money, not credit balances based on deposits with others, but on property, localized, specified money which is held in "safe deposit." In that regard, the court well said: "In order to recover in the instant case the plaintiffs are required to file a statement of claim which asserts facts that plainly bring them within the coverage of the bond. The pleader's conclusions of law or fact, unsupported by the basic facts, will not do; and such basic facts must be alleged, not left to inference. The bond in suit, as this court interprets it, is an agreement to indemnify . plaintiffs for the theft, or its equivalent, of tangible articles, such as those mentioned in the bond, and is not to be widened by the clause, 'or other fraudulent means,' supra, so as to include every loss resulting from fraud. Under the provision of the contract upon which plaintiffs rely the property must be within the insured's offices, or upon the premises of insured's bankers, or in any recognized place of safe deposit. A bank credit, or a credit with an agent or broker, has no localization. Money deposited with a bank (not in a safe deposit box) is not money of the depositor, but of the bank."

Agreeing therewith, and without further discussion of other contentions made, all of which have been duly considered, we are of opinion that the plaintiff has not in its pleadings shown a cause of action on the bond, and the judgment below is therefore affirmed.

· BIGGS, Circuit Judge (dissenting).

I must respectfully dissent from the majority opinion in this case for the following reasons:

The statement of claim filed by the appellant states in part:

"The firm of Rhoades & Company was at all times hereinbefore complained of a recognized place of safe deposit.

"At the times hereinbefore complained of, plaintiff had on deposit with the said Rhoades & Company in the Bank of Manhattan Company, New York City, which Bank is a recognized place of safe deposit, large sums of money.

"On or about January 7th, 1935, the Sterling Investment Corporation fraudulently obtained from Rhoades & Company and the Bank of Manhattan Company, the sum of $28,150.00, the property of and belonging to plaintiffs."

The "sum of $28,150.00," stated above, refers to the phrase "large sums of money" set out in the second paragraph quoted.

Money is universally defined as metal, coined or stamped, or as a written or stamped promise or certificate such as a government note or bank note, issued by recognized authority as a medium of exchange. Webster's New International Dictionary defines money as "Any material that by agreement serves as a common medium and measure of value in trade." It therefore seems apparent that by the use of the word money in that portion of the statement of claim set out above the appellant has pleaded that bank notes or specie were obtained fraudulently from Rhoades & Co., "a recognized place of safe deposit," and that such currency or specie was the property of the appellant.

A copy of the bond was attached to and made part of the statement of claim. Under it the indemnity company, the appellee, is liable for "any loss * * * of money * * * in which the insured has a pecuniary interest * * * sustained through larceny, whether common law or statutory * * * or other fraudulent means * * * while the property is within any of the insured's offices * * * or upon the premises of the insured's bankers * * * or in any recognized place of safe deposit."

The term "money" is defined in the bond to have its ordinary meaning of "currency, coin, bank notes. * * *"

The question now before the court is simply the determination of the sufficiency of the pleading, and every well-pleaded allegation of fact in the statement of claim must be taken to be true.

It will be noted by a comparison of the terms of the bond and the statement of claim that the appellant has pleaded the loss through fraudulent means of its money held in safe deposit, and that such pleading brings the appellant within the terms of the bond.

The conclusion follows that such a loss as is pleaded cannot be a trading loss.

For these reasons, the judgment of the court below should be reversed.