**SHERWOOD & ROBERTS-KENNE-WICK, INC., a Washington Corporation, Appellant,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Minnesota Corporation, Appellee.**

No. 17954.

United States Court of Appeals Ninth Circuit.

Aug. 22, 1963.

Sherwood, Tugman & Green, and William M. Tugman, Walla Walla, Wash., for appellant.

Palmer, Willis & McArdle, and Fred C. Palmer, Yakima, Wash., for appellee.

Before CHAMBERS, HAMLIN and DUNIWAY, Circuit Judges.

HAMLIN, Circuit Judge.

Sherwood & Roberts-Kennewick, Inc., a Washington corporation, hereinafter referred to as appellant, filed an action in the United States District Court for the Eastern District of Washington against St. Paul Fire & Marine Insurance Company, a Minnesota corporation, hereinafter appellee, to recover damages under a Mortgage Bankers Blanket Bond purchased by appellant from appellee. The bond provided in part that appellee "undertakes and agrees to indemnify the insured, and their successors and assigns, all such losses not exceeding $250,000 * * * (1) By Reason of the fraud, dishonesty, forgery, theft, larceny (whether common law or statutory), embezzlement, wrongful extraction or misappropriation, or any other dishonest, criminal or fraudulent act, of any officer, clerk, servant or guest student of the Insured wherever committed and whether committed directly or in connivance with others."

The complaint alleged that losses were incurred by reason of the dishonest or fraudulent acts of Robert D. Chamberlin, a vice-president of appellant and general manager of appellant's operations in Pasco, Kennewick and Richland, Washington, particularly those acts committed in connivance with one Palmer Walker, a dealer in motor vehicles.[1]

The parties stipulated that damage questions were to be reserved for later court determination and the liability questions were submitted to the jury in the form of interrogatories. From the adverse verdict, appellant filed a timely

---

1. In a pre-trial order the parties agreed that the complaint should be expanded to include dishonest or fraudulent acts of Dean Dion, Kermit Krueger, John Koster, and transactions involving Donald K. Williams, d. b. a. T&W Motors.

Apparently it was the theory of appellant that by reason of the activities of Chamberlin in unjustifiably extending credit to Walker and others and in failing to collect "unsafe" loans, appellant was unable to collect the balances due on such loans.

appeal, of which this court has jurisdiction under 28 U.S.C. § 1291.

Sherwood & Roberts, Inc., Walla Walla, Washington, and its affiliated corporations, which included Sherwood & Roberts-Kennewick, Inc., appellant herein, Fairway Finance-Kennewick, Inc., Sherwood & Roberts-Pasco, Inc., and Fairway Finance-Pasco, Inc., conducted a general mortgage loan, finance, insurance and real estate business. Each of the four mentioned corporations was insured under the bond. Robert D. Chamberlin was employed by appellant in 1951. He advanced in the firm, and from July 22, 1958, was general manager of the activities of the four corporations with his headquarters in Kennewick, Washington. He was an experienced finance man in charge of the making and servicing of loans totaling several million dollars annually. His superiors in appellant were located in the home office at Walla Walla, Washington, some fifty miles from Kennewick. Dion, Krueger and Koster, mentioned above, were employed by some of the appellant corporations at the instance of Chamberlin.

Palmer Walker was a dealer in motor vehicles and owned and controlled various companies, including Walker Motor Company of Kennewick, Walker Motor Company of Union Gap, and European Motors of Kennewick, which later changed its name to Tri-City Rambler, Inc. Donald K. Williams d. b. a. T&W Motors operated a used car lot in Kennewick from March, 1957 to June, 1958.

Appellant (through Chamberlin) financed Palmer Walker and his corporations by making capital loans, personal loans, flooring loans and by the sale and financing of cars owned by appellant's employees through Walker and his companies. During the period from 1953 to 1959, Walker personally and his companies paid off appellant's loans in the sum of $2,357,826. Over $48,000 in interest was charged and received by appellant on these loans. From 1956 to 1959 appellant received discounts from consumer contracts purchased from Walker companies in an amount over $80,000.

During a part of this period appellant also financed automobiles for Donald Williams d. b. a. T&W Motors. Many of the cars so financed were owned by appellant's employees.

Two interrogatories were submitted to the jury, one asking whether Chamberlin had committed any acts of fraud or dishonesty in connection with certain transactions involving Palmer Walker and his corporations and the other whether Chamberlin, Krueger, Koster and Dion had committed any acts of fraud or dishonesty in connection with certain transactions involving Donald Williams.[2] Both questions were answered in the negative by the jury.

Appellant contends on appeal that: (1) the undisputed evidence clearly showed that appellant was entitled to a directed verdict and that the court erred in failing to grant appellant's motion for such a verdict at the close of the evidence and in failing to grant its motions for judgment notwithstanding verdict or in the alternative its motion for a new trial; (2) the court erred in its instructions to

2. "With respect to the Palmer Walker transactions, did Robert D. Chamberlin, acting directly or in connivance with others, commit any act of fraud or dishonesty in connection with making renewals, extension, consolidations or failure to collect any loan or loans made to European Motors, Tri-City Motors, Tri-City Rambler, Inc., or Walker Motors, Inc.-Kennewick during the period between February, 1958, and November, 1958, and culminating on March 25, 1960? No.

"With respect to the transactions involving Donald K. Williams, doing business as T&W Motors, did Robert D. Chamberlin, John Koster, Dean Dion, or Kermit Krueger, acting alone or in connivance with each other, or with others, commit any act of fraud or dishonesty in connection with making renewals, extensions, consolidations or failure to collect any of the loans made to Donald K. Williams, doing business as T&W Motor during the years 1957, 1958 and 1959? No. "

the jury on the meaning of "dishonesty and fraud", as used in the bond and in failing to give an instruction offered by appellant on the same subject; and (3) the court erred in rejecting certain offers of proof made by appellant and in failing to admit certain evidence relating to alleged admissions against interest of appellee.

We shall first consider appellant's contention that the district court erred in its instructions to the jury on the meaning of the terms "dishonesty and fraud" and in failing to give an instruction offered by appellant [3] on the same subject. It is the position of appellant that the instruction given by the court, set forth in the margin below,[4] "wrote no harm will result but it is nonetheless dishonest. Dishonesty is included in fraud. An integral part of each act is an intent to deceive.

"The term 'connivance' likewise should be given the usual meaning as the ordinary person understands it to be. This definition, though, may be helpful to you: 'Connivance relates to an agreement or consent, indirectly given, that something wrongful shall be done by another.' In other words, it defines a situation where one person knowing another is doing wrong allows such conduct to continue without interference.

"As you will recall, the parties have agreed that only fraud and dishonesty need be considered in this case. This is because the other bond provisions, to-wit, forgery, theft, larceny, misappropriation and wrongful abstraction, all are equivalent to dishonesty and fraud as I have defined those words. Thus, it is not necessary for the plaintiff to establish that any of the four principals was guilty of a criminal act, or that he would be subject to criminal prosecution of any kind. Therefore, if you find that fraud or dishonesty, or both, including intent to defraud the plaintiff, have been proved to your satisfaction by a fair preponderance of the evidence as to any of the plaintiff's contentions which I recited earlier, the plaintiff has sustained its burden of proof as to such contention or contentions. However, if you find that neither fraud nor dishonesty, including intent to defraud the plaintiff, have been proved to your satisfaction by a fair preponderance of the evidence, then in that event the plaintiff has not sustained its burden of proof as to such contention or contentions.

"Fraud in its nature is not a thing readily susceptible of direct proof. Fraud must, in its very nature, usually be proved by inferences and circumstances shown to have been involved in the transactions which are in question. The same is true with respect to dishonesty. In this regard I instruct you that it is reasonable to infer that a person ordinarily intends all the natural and probable consequences

3. Appellant requested that the following instructions be given:

"You are instructed that when an act indicates a reckless, willful and wanton disregard for the interest of the employer, and palpably subjects him to likelihood of loss, such conduct is, in law, dishonest. This is true, even though an employee, or employees, acting individually or jointly with others, may at the time entertain hope that no loss will be ultimately sustained by the employer as a result of any such reckless, willful or wanton disregard of the employer's interests. Dishonesty embraces any act involving lack of integrity or lack of trustworthiness on the part of an employee but not mere mismanagement or use of poor business judgment or negligence on the part of an employee."

"The words dishonesty and fraud as used in the fidelity bond in this case are to be broadly interpreted to include any act or concealment by an employee indicating moral turpitude or lack of honest consideration of the rights of the employer to loyal and faithful performance of duties by the particular employee or employees whose conduct is here under your scrutiny."

4. "The terms 'fraud' or 'dishonesty', as used in the bond, are to be given their usual meaning as the ordinary person understands them. However, I will give you a brief definition of each which should aid in guiding your understanding of these words as they are used in the bond.

"Fraud consists of some deceitful practice or willful device, resorted to with intent to deprive another of his right, or in some manner to do him injury. As distinguished from negligence or an injury caused by thoughtlessness, it is always intentional. Fraud in its very essence requires a preconceived intention to deprive another of some property or money.

"Dishonesty likewise consists of some intentional act which is committed with the foreknowledge that injury will result or is likely to result to another person. A dishonest act may be done with the hope that it will go undetected or that

dishonesty out of the bond and out of the case." We do not agree.

of acts knowingly done or knowingly omitted.

"In your consideration of this case you must presume that all men are honest and that individuals deal fairly, that private transactions are fair and regular, and that participants act in honesty and good faith. This presumption must continue to guide you until you are satisfied to the contrary.

"There is no liability under the bond and the law does not impose any liability on the part of the defendant for neglect, incompetence, the unwarranted extension of credit, losses resulting from mismanagement or the use of poor business judgment by any of the principals covered under the bond. Also, there is no liability for mere debts arising out of the acts or omissions of any of the principals.

"In short, if you find that the acts or omissions which the plaintiff claims were dishonest and fraudulent were instead only the unfortunate result of good faith transactions, then the plaintiff has not sustained its burden of proof.

"As to each of the contentions involving alleged dishonesty or fraud, you will consider all of the facts and circumstances in the evidence, including the relationships of the said principals to their employer and to each other, and to third persons or parties who were referred to or connected with any transaction or occurrence revealed by the proof.

"The relationship of employer and employee requires the following duties upon the part of the employee to the employer:

"1. That an employee is not to seek personal gain, with respect to his employment, beyond his agreed compensation without first disclosing the circumstances to and obtaining the approval of his employer.

"2. That an employee is not to engage in any transaction for personal profit with a customer of the employer with whom the employee deals, without the employer's knowledge and consent.

"3. That an employee is not to engage in any business activity which conflicts with or may be detrimental to the employer's interest, without the employer's knowledge and consent.

"4. That an employee is not to conceal or withhold information, such as a borrower's true financial status or ability to repay money loaned, which information is necessary to the employer's competently and intelligently evaluating his business risks.

"Dishonest" is defined in Webster's New International Dictionary, Second

"5. That an employee is not to acquire or maintain any ownership interest in the business of a customer or the employer with whom the employee deals without his employer's knowledge and consent.

"6. That an employee is not to borrow money from his employer without the employer's knowledge and consent.

"7. That an employee is not to release collateral securing a loan made by the employer which increases the business risks of his employer without the employer's knowledge and consent.

"8. That an employee is to take adequate security for loans made by or on behalf of the employer which the known facts indicate require such security unless the employer with full knowledge of the facts and circumstances consents otherwise.

"9. That the employee so far as possible shall follow the employer's instructions as to all things pertaining to the relationship.

"A breach of one or all of the foregoing duties does not necessarily in and of itself indicate that there was any fraud or dishonesty with respect to the plaintiff's contentions. In fact, mere breach of duty without fraud or dishonesty, as I have heretofore defined those terms, is not a sufficient basis upon which you can find for the plaintiff or answer an interrogatory in the affirmative. However, you may consider such breach, if any, in determining whether any one or more of the principals acted fraudulently or dishonestly, keeping in mind, however, that the plaintiff must prove its contentions to you by a fair preponderance of the evidence.

"The plaintiff contends and the defendant concedes that there was a lack of good faith on the part of the principal John Koster in his signing the name of John Kiltheau to a check made payable to said Kiltheau in the amount of $425.00. You may only consider this, however, together with all other evidence in the case, for the purpose of determining whether John Koster acted fraudulently or dishonestly, with respect to the plaintiff, as I have defined those terms, keeping in mind that the plaintiff must prove its contentions to you by a fair preponderance of the evidence.

"While the law will not presume fraud or dishonesty nor infer it merely because loans made by an employee of his employer's funds were irregular, unsafe or unsound, such factors may nevertheless be considered by you together with

Edition, as "characterized by fraud; indicating a lack of probity; knavish; fraudulent; unjust" or "disposed to cheat or defraud." In Black's Law Dictionary, Fourth Edition, the word "fraud" is described as consisting "of some deceitful practice or willful device, resorted to with intent to deprive another of his right or in some manner to do him an injury" or, more generically, as "embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another by false suggestions or by suppression of truth, and includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." Although perhaps not synonymous terms, "fraud" and "dishonest", as generally used, have similar meanings. Implicit in each is the concept of "bad faith" or an intent to accomplish some wrongdoing. The district court specifically instructed the jury that if the acts or omissions which the appellant claimed were dishonest or fraudulent were the result of "good faith" transactions, the appellant had not sustained its burden of proof. We feel that the instructions given sufficiently apprised the jury of the state of mind necessary to characterize an act as dishonest or fraudulent, as distinguished from a mere exercise of poor judgment or negligence, and can see no way in which appellant could have been prejudiced by them.

■■ Appellant's contention that the court erred in failing to direct a verdict in its behalf is similarly without merit. A motion for a directed verdict raises solely a question of law, the movant taking the position that there are no controverted issues of fact upon which reasonable men could differ.[5] In determining whether the motion should have been granted, we must consider the evidence in its strongest light in favor of appellee and must give appellee every fair and reasonable intendment that the evidence can justify.[6] The record is voluminous in this case and we do not intend to set forth in detail all of the evidence presented by each party on each of the several transactions at issue. The evidence introduced concerning these transactions was conflicting and could not be said to establish as a matter of law that any of the transactions involving Walker or Williams, which allegedly resulted in appellant's losses, involved fraud or dishonesty on the part of appellant's employees. Chamberlin testified at length concerning the principal transactions relied upon by appellant as showing fraud or dishonesty, e.g., sale of vehicles by Walker "out-of-trust",[7] and if his testimony were to be believed it could be concluded that his actions were within the scope of his authority and were dictated solely by his business judgment. Appellant's contention that Chamberlin concealed information from his superiors as to the facts of the loans or as to Walker's actions in connection therewith was denied by Chamberlin. He contended that his daily reports to the main office gave all necessary pertinent information about the status of the Walker loan transactions and that at all times persons in the main office had adequate information. The

all of the evidence to aid in the correct determination of whether fraud or dishonesty was, in fact, involved in any of the transactions contended by the plaintiff to have been fraudulent or dishonest.

"If any one of the principals is found from a fair preponderance of the evidence to have made or caused to be made any dishonest or fraudulent loan to a borrower or borrowers, then it would be immaterial that any such principal. at the time of making any such fraudulent or dishonest loan, may have hoped or expected that the particular borrower might ultimately repay such loan or loans."

5. See Moore's Federal Practice, Par. 50.02 [1] and the cases cited therein.

6. *Ibid.*

7. Loans to Walker were often secured by chattel mortgages on vehicles to be sold by Walker. Under the terms of the mortgages repayment of the loans was to be made out of the proceeds realized from the sale of the vehicles. When the proceeds were not so applied, the vehicles were considered to have been sold "out-of-trust."

credibility of his testimony was manifestly a matter for the determination of the jury and the jury chose to believe him.

Except in two instances, appellant did not contend that Chamberlin personally profited as a result of any of the transactions. We shall discuss the two exceptions.

In one, appellant contends that in connection with the purchase and sale by Chamberlin of a Simca automobile and the loan transactions in connection therewith, Chamberlin improperly obtained some funds from appellant. The transaction was a complicated one. It had occurred some four years before the trial, and although certain records were introduced of the transaction, it was not clear exactly what had happened. There was, however, testimony by Chamberlin and by another employee of the appellant companies (O'Herin) that Chamberlin received no money improperly as a result of the deal. The jury apparently chose to believe these witnesses and the credibility of their testimony was of course a matter for the jury's determination.

In the other instance, it was shown that in July, 1959, Chamberlin received ten shares of non-voting stock in one of the Walker companies without the knowledge of appellant. During this period the evidence showed that Walker was involved in a great many financial transactions and with a number of different companies. His affairs, to say the least, were complex. Chamberlin testified that in January of 1959 Walker told him that he was trying to arrange his estate, and wanted him to act as a trustee of his estate. Chamberlin stated that he would so act. The next discussion about the matter was about ninety days later. Chamberlin testified that Walker told him that he (Walker) had been advised by his attorney that the trusteeship "or governing body of the estate would be the three managers of his corporations * * *, Colvins, Decker and Jumper, and that I was to be trustee and have authority over these men and that I was to be issued stock in the corporation." The stock was to be in one of the companies. Later, on July 15, 1959, in Walker's office, Walker told Chamberlin that he had gone over the situation with his attorney, and that his attorney had advised him that the naming of the other directors of the trusteeship by name was not a satisfactory situation, that therefore they would be named by position, namely, managers of his other corporations, and that Chamberlin was still to have stock in Rambler and be the governing member of the trusteeship. Walker at that time told Chamberlin how he would like his companies operated in the event of his death. Chamberlin received ten shares of nonvoting stock at this meeting and he was instructed that he had no authority whatsoever in Walker's affairs until such time as the trusteeship came into being. No dividends were ever paid on this stock, and in fact appellee contends that based upon the assets and liabilities of the company the stock had a negative or minus value. At or near the time that Chamberlin's resignation from appellant was accepted, the stock was returned by Chamberlin to Walker. Concerning this matter, Chamberlin testified in part as follows:

"THE COURT: In other words, did it occur to you that there might be a conflict of interests with Sherwood & Roberts or that your so taking this stock might have a benefit to Sherwood & Roberts?

"A: The stock didn't enter in, but the fact that we would have first knowledge of the estate I thought woud be a benefit, yes. We had obligations with the corporation and if it was an immediate thing, why, we would be certainly advised and protected * * * and have first hand knowledge of anything that was happening in Mr. Walker's estate."

Again, it appears that the jury accepted Chamberlin's explanation of this transaction, and we certainly cannot say as a matter of law that his conduct was either fraudulent or dishonest.

Another practice appellant complained about was that, during a portion of 1958 and on one or two occasions in 1959 Chamberlin exchanged checks of the Walker companies for checks of the appellant companies. This could be colloquially described as check kiting. The evidence disclosed no loss resulting to any party from this practice. Chamberlin explained in detail the situation as it existed during this period of time. He stated that he was experiencing difficulty in getting enough funds from the home office in Walla Walla to take care of the volume of business which had been committed in the Tri-City area. Apparently the Walla Walla home office was also in need of funds and was making demands for the return of funds. At times, this resulted in a book overdraft on the daily cash book of Sherwood & Roberts-Kennewick, Inc. Chamberlin explained that because of the overdraft situation and the further fact that the books could not be closed at the end of the month unless they were in the black, on certain occasions the practice of exchanging checks with the Walker companies was indulged in. He testified that the president of the company, Mr. Sherwood, had knowledge of the fact that there were book overdrafts upon the daily cash reports of Sherwood & Roberts-Kennewick, and that Sherwood talked with him about it. Chamberlin testified concerning this conversation that "He called me and related that he was conscious of what was—what the situation was, wanted to put me on notice that a book overdraft was one thing. However, if the book overdraft resulted in a bank overdraft, that I would be, in his terms, and I quote, standing alone." Chamberlin's testimony as to this conversation was not rebutted by Sherwood.

While the check kiting practice was not one to be commended, since no financial advantage was gained by either party and in view of Chamberlin's contention, apparently believed by the jury, that it was only a practice used for the purpose of balancing the books, we cannot say as a matter of law that it was either fraudulent or dishonest.

After a careful consideration of the entire record, we hold that the district court properly denied appellant's motion for a directed verdict. We also hold that there was ample evidence in the record to support the verdict.[8]

Appellant's final contention concerns the rejection of an offer of proof made by it in the absence of the jury.[9] The offer of proof was intended to show that on June 30, 1960, Donald Sherwood, president of appellant had a telephone conversation with one Jones, claims superintendent of appellee, in which Jones said that Chamberlin and Walker "were in it together" and "were both guilty" and that they "should try to get together, save them going to joint rooms in Walla Walla"; and that Jones had said in a later conversation on that same day that appellant's reputation was such that "it couldn't be associated with two crooks like Walker and Chamberlin."

The district court refused to allow these statements into evidence on the basis that they were too indefinite and general to be considered as admissions against interest and that their over-all prejudicial effect would considerably outweigh "any probative value they might have." We hold that the district court

---

8. We are not permitted to weigh conflicting evidence, judge credibility of witnesses, and in so doing arrive at a conclusion different from that reached by the jury. "Only when there is a complete absence of probative facts to support the conclusion (verdict) reached does a reversible error appear." Lavender **v.** Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L. Ed. 916 (1946).

9. Appellant also contends that the court erred in refusing to strike certain testimony given by one Day concerning negotiations in the late spring and early summer of 1960 between appellant and Walker's representatives. We can see no prejudice to appellant as a result of the court's refusal, and further, consider appellant's contention to be without merit.

properly refused on these grounds to admit the statements into evidence.

An examination of the entire record convinces us that the case was fairly tried and that the judgment should be affirmed.