IMPERIAL INSURANCE, INCORPO-
RATED, American Homeowners
Insurance Company

v.

The EMPLOYERS' LIABILITY ASSUR-
ANCE CORPORATION, Limited,
Appellant.

No. 23031.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 1970.

Decided May 28, 1970.

Rehearing Denied Aug. 7, 1970.

Leventhal, Circuit Judge, on original hearing concurred in result and in parts of majority opinion and filed opinion, but on rehearing dissented from denial of petition for rehearing and on reconsideration dissented from judgment of reversal.

Mr. Alexander M. Heron, Washington, D. C., with whom Messrs. Preston C. King, Jr., and Murray S. Simpson, Jr., Washington D. C., were on the brief, for appellant.

Mr. Joseph W. Kiernan, Washington, D. C., with whom Mr. J. Philip Smith, Washington, D. C., was on the brief, for appellees.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

FAHY, Senior Circuit Judge:

Imperial Insurance, Incorporated, and others,[1] appellees, sued Employers' Liability Assurance Corporation, appellant, on a policy issued by Employers' to Imperial protecting the latter against:

> Loss of Money, Securities and other property which the insured shall sustain, to an amount not exceeding in the aggregate [$100,000] * * * through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.

Recovery in the full amount of liability was sought, because of payments in excess of that amount made by Imperial under three fire and casualty policies issued by it allegedly by reason of the fraudulent or dishonest act or acts of its vice-president and general manager.[2] The jury rendered a verdict in favor of Imperial for $100,000.00. On this appeal by Employers' from the ensuing judgment we hold that the policy sued on covered the type of loss claimed. We reverse, however, because of an instruction to the jury which we deem erroneous and prejudicial.

The three policies under which it paid the losses were among a number issued by Imperial in an expansion of its business by the general manager into surplus lines of insurance which entailed risks of greater than normal hazards. We need not detail the evidence on the issue whether the risks which led to the payments claimed as losses were assumed by Imperial as a consequence of the fraudulent or dishonest act or acts of its general manager; for Employers' does not now dispute the sufficiency of the evidence to support the verdict based

on the jury's findings to that effect, though it does reserve for our decision the correctness of a portion of the court's instructions to the jury.

## I.

We consider first Employers' contention that the consequential loss Imperial suffered is not covered by the policy. More precisely the contention is that Employers' insured Imperial only against the physical loss of "Money, Securities and other property" due to the conduct of Imperial's employees, not against a consequential pecuniary loss measured by payments it made to third parties under Imperial policies. Employers' supports this contention by reference to the definition of "Money" in the policy sued on:

> "Money" means currency, coins, bank notes and bullion; and travelers checks, register checks and money orders held for sale to the public.

Employers' further supports its position that it insured Imperial only against loss of a physical character by contending that these consequential losses of Imperial do not come within "other property." It says the maxim *ejusdem generis* requires "other property" likewise to be limited to property of a physical or corporal character. Still other provisions may be thought to add plausibility to Employers' position. Thus, in its reference to loss "Inside and Outside" the premises of Imperial the policy refers to Money and Securities lost "by the actual destruction, disappearance or wrongful abstraction thereof," and "loss of other property" by burglary or robbery, and, moreover, Section 9 provides that Employers' shall in no event be liable as respects securities or property for more than the actual cash value thereof.

Nevertheless, we are constrained to hold that it is not so clear consequential

---

1. American Homeowners Insurance Company became a successor to Imperial Insurance and was added as an original party plaintiff as a result of amalgamation.

2. Recovery was also claimed for certain uncollected premiums on other policies issued by Imperial and attributable to like conduct of the general manager.

losses were not covered as to free the policy of ambiguity in this regard. The loss here was a pecuniary depletion of Imperial's monetary assets. In that sense it was a loss of its property. Moreover, the definition of money as "currency, coins, bank notes and bullion," when followed by the general expression "other property," does not clearly exclude liability to compensate for payments made from the insured's funds, if due to the misconduct described. It is true this gives a meaning to the policy not explicitly expressed. But it obtains support from the general purpose of the policy to protect against loss due to the fraudulent or dishonest conduct of an employee. To adopt a more restrictive interpretation tied to the policy's definition of the medium by which loss may be represented, such as "currency, coins" and the like, is not required, particularly since the whole of the definition leaves unclear what is intended by the loss of "other property."

While there are cases which point in a direction favorable to appellant,[3] the case of Paddleford v. Fidelity & Casualty Co., 100 F.2d 606 (7th Cir. 1938), cert. denied, 306 U.S. 664, 59 S.Ct. 789, 83 L.Ed. 1060 (1939), gives support to Imperial's position that coverage extends beyond loss of money or property by physical expropriation or destruction. There the loss was due to fictitious and fraudulent trades carried on by the manager of the insured. He filled in checks for more than he was authorized to do, resulting in depletion of the insured's bank account. The court held that the consequent loss was covered by a bond protecting against dishonest acts of an employee which caused loss of "money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, bills of lading, warehouse receipts, checks or other similar securities in which the insured has a pecuniary interest." The

bond described "money" to mean "currency coin bank notes, bullion and uncancelled United States postage and Revenue stamps." From this it was argued that the loss sustained was not money but merely a depletion of the insured's credit with the bank. The court described this position as meaning the property protected was only that which was tangible, as Employers' now urges, and held that this was not justified. The court pointed to the description of property, other than money, as including "checks or other similar securities," and noted that the policy protected against forgery. However, the court added:

> Irrespective of whether the term "money," as that term is defined in the bond, is sufficient to cover plaintiffs' loss, we are of the opinion that the word "checks" is sufficiently broad to include a loss sustained by their improper and unauthorized use which directly resulted in the depletion of plaintiffs' bank account.

100 F.2d at 614.

*See, also,* Hooker v. New Amsterdam Casualty Co., 33 F.Supp. 672 (W.D.Ky. 1940); Insurance Company of North America v. Greenberg, 405 F.2d 330 (10th Cir. 1969).

Quite recently the Supreme Court reiterated in United States v. Seckinger, 397 U.S. 203, 216, 90 S.Ct. 880, 888, 25 L.Ed.2d 224 (1970), the principle that when ambiguous a contract "should be construed less favorably to that party which selected the contractual language." This canon of construction has not infrequently been applied to insurance policies. American Surety Co. v. Pauly, 170 U.S. 133, 144, 18 S.Ct. 552, 42 L.Ed. 977 (1898); Smith v. Indemnity Insurance Co., 115 U.S.App.D.C. 295, 318 F.2d 266, cert. denied, 375 U.S. 904, 84 S.Ct. 497, 11 L.Ed.2d 146 (1963); Continental Casualty Co. v. Beelar, 132 U.S.App.D.C. 1, 2, 405 F.2d 377, 378

---

3. *See* Levy v. American Mutual Liability Insurance Co., 195 Md. 537, 73 A.2d 892 (1950), dicta in Virginia-Carolina Chemical Corp. v. Hartford Accident & Indemnity Co., 339 F.2d 413 (4th Cir. 1964); and *see* Degener v. Hartford Accident & Indemnity Co., 92 F.2d 959 (3d Cir. 1937).

(1968). We apply it to this policy and agree with the District Court that it included the kind of loss claimed by Imperial.

## II.

We consider now whether Imperial complied with the proof of loss provisions of the policy. Its Section 8 provides:

Upon knowledge or discovery of loss or of an occurrence which may give rise to a claim for loss, the Insured shall (a) give notice thereof as soon as practicable to the Company or any of its authorized agents and * * * (b) file detailed proof of loss, duly sworn to, with the Company within four months after the discovery of loss.

From the foregoing it seems clear that upon either (1) discovery of loss or (2) discovery of an occurrence which may give rise to a claim for loss, notice must be given under "(a)" above. It is not so clear when the detailed proof of loss must be filed, for the reference to this in "(b)" ambiguously states that it is to be filed within four months after discovery of loss, thus omitting reference to discovery of an occurrence which may give rise to a claim for loss. It is not clear whether the four months begins to run from the latter occurrence or from the actual discovery of loss. What actually occurred is that Imperial wrote to Employers' January 6, 1965, as follows:

Please accept this as notice of a probable claim under the subject bond [the policy in suit].

We are not in a position at this time to furnish complete details as to a claim; however, if you wish to set up a file, may I suggest you contact Mr. R. L. Hayden, Jr., at this office. [The office of Imperial]

The detailed and formal proof of loss, however, was not filed until June 9, 1965.

Imperial's position is that the "occurrence" which triggers the requirement of notice, when Section 8 is read with Section 11 of the policy,[4] did not occur as early as January 6, 1965, or until within four months of June 9, 1965, at which time Imperial discovered the aggregate liability of Employers' or, in any event, Imperial contends, there was an issue as to when the loss was discovered and this issue was properly submitted to the jury. Employers', however, contends the evidence established as matter of law that Imperial discovered the loss prior to the end of December 1964, and that accordingly proof of loss, not filed within four months of such discovery, was too late. It accordingly sought the instruction set forth in the margin,[5] which was denied. The denial was proper, for, all else aside, the instruction disregarded the issue of waiver of the four months requirement, which was raised by the evidence.

The submission to the jury of the issues of timeliness of proof of loss and of waiver was in the following terms:

You must determine exactly when Imperial discovered the loss which it claims by virtue of the fraudulent or dishonest act or acts by [the general manager]. If you find from the evidence in the case that Imperial discovered that loss sometime within a four month period, ending on June 9, 1965, then the proof of loss was timely filed, but if you find that the loss was discovered more than four months prior to June 9, 1965, then the proof

---

4. Section 11 provides:
   All loss incidental to an actual or attempted fraudulent, dishonest or criminal act or series of related acts at the Premises, whether committed by one or more persons, shall be deemed to arise out of one occurrence.

5. The jury are instructed that the plaintiff failed to file with the defendant any proof of loss within four months from the discovery of the loss, as required by the bond, because plaintiff discovered the loss well prior to the end of December, 1964, and did not file a proof of loss until June 9, 1965. [Requested instruction No. 28]

of loss was not timely filed. If you find from the evidence that the proof of loss was not timely filed, then I instruct you that there has not been technical compliance with the provision of law which says that it must be filed within one hundred and twenty days from the time the loss was discovered. However, recovery is not necessarily denied merely because the proof of loss was not timely filed. This is so because you may find from the evidence, as a matter of fact, that there has been a waiver of the provision of the policy requiring proof of loss within a certain period.

■ Employers' contends that this confused the issue of timeliness by failing to point out that proof was to be filed within four months from actual discovery of loss, not from ascertainment of its full amount. But Employers' did not object to the instruction as given. No clarification was sought. The confusion was not called to the trial court's attention. In this situation we are not justified in reversing because of this instruction. The case was tried by experienced counsel for these companies. Employers' sought a verdict upon the basis of the evidence—reserving only particular legal questions for review should it fail in that regard. We are not called upon to depart from this trial plan of counsel. Moreover, there was ample evidence upon which to submit the issue of waiver to the jury,[6] assuming waiver was not required to be by written endorsement on the policy, a question we now consider.

## III.

■ Section 19 of the policy provides:

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy signed by an authorized representative of the Company.

The District Court held this provision did not prevent waiver orally or by conduct of the time specified in the policy for proof of loss, or preclude estoppel of Employers' from insistence upon compliance by Imperial with the four month provision. The court distinguished this provision from others which constitute "a part of the contract of insurance and the proper investigation as to the issues of its formation and existence. Such a clause [Section 19] * * * has no reference to those stipulations which are to be performed after the loss, such as giving notice and furnishing proof of loss." While the instructions on waiver were not objected to by Employers', at an earlier stage of the proceedings there had been a full exchange between court and counsel at which Employers' position had been rejected. We accordingly hold that Employers' adequately reserved for review its position on waiver. We agree, however, that the time specified in the policy for proof of loss could be waived orally or by conduct. This is the

---

6. At the request of Imperial a meeting was held with representatives of Employers' on March 4, 1965 to discuss the progress of the investigation into the insurance claim. While denied by witnesses for Employers', the following statement was attributed to Mr. Schramm, Employers' Washington Branch Manager: "I do not want you to file a proof of loss piecemeal. * * * I want you to find out what your entire loss is and then after you have found that out, then file a proof of loss covering all of the losses that

you have sustained. Do not file a partial or piecemeal claim. * * * Do not file it that way. * * * Wait and file it after you have gotten all of the facts." There was further testimony that the officers of Imperial and Employers' were located on the same floor of the same building, and that Mr. Schramm of Employers' was kept informed of the progress of the investigation after the March 4th meeting and that it was not until May 1965 that he requested a proof of loss statement.

fair implication of our decision in Ace Van & Storage Co. v. Liberty Mutual Insurance Co., 119 U.S.App.D.C. 6, 336 F.2d 925 (1964), and is supported by the holding of Prudential Ins. Co. of America v. Saxe, 77 U.S.App.D.C. 144, 158, 134 F.2d 16, 30, cert. denied, 319 U.S. 745, 63 S.Ct. 1033, 87 L.Ed. 1701 (1943).

## IV.

We now come to the instruction which we conclude erroneously prejudiced Employers'. Of critical importance was the factual issue of whether the general manager acted fraudulently or dishonestly. The jury was called upon to appraise the character of his conduct. The court recognized this; and as has been held, "there must [be found to] exist a compelling sense of conscious wrong rather than a mere omission or act amounting to negligence," Sade v. Nat. Surety Corp., 203 F.Supp. 680, 684 (D.D.C.1962), aff'd, 114 U.S.App.D.C. 281, 314 F.2d 286 (1963), or a mere lack of judgment, Sherwood & Roberts-Kennewick, Inc. v. St. Paul Fire and Marine Ins. Co., 322 F.2d 70, 75 (9th Cir. 1963). The jury's task was made difficult by the indirect type of the loss involved. There is no evidence the loss attributed to the general manager produced a personal gain. Unlike losses from a direct theft or manipulation of money or securities, the conduct of the general manager does not so readily suggest the intentional wrongdoing against which the policy was designed to protect.

To establish his fraudulent or dishonest conduct Imperial heavily relied upon the general manager's failure to disclose the surplus risk policies in an annual statement of financial position required to be filed with the Superintendent of Insurance for the District of Columbia by D.C.Code § 35–103. In calling the jury's attention to these provisions the court instructed the jury, having also in mind, no doubt, Title 35 § 1312, set forth in the margin,[7] as follows:

Any officer or employee signing and swearing to that annual statement, knowing that the statement contains false information is subject to criminal prosecution. If you find from the evidence that the employee, [the general manager], signed and swore to the Imperial Insurance Company's annual statement of 1963, that that statement did not contain, or could not contain the excess surplus lines, risks, he had committed the company on or had caused the company to be committed on during the year 1963 and which was still in force on December 31, 1963 then you are instructed that such act on [the general manager's] part was fraudulent and dishonest within the terms of the bond, only if, as a result of violation of the statute, loss is in fact sustained by Imperial Insurance Company, Inc.

At the conclusion of the instructions, in response to inquiry by the court, counsel for Employers' stated: "I only object to that portion which had to do with [the general manager]; I object to the statement concerning criminal prosecution under the statute."

■ While it is true the objection may be construed as directed only to the reference to criminal prosecution, we think fairly construed it goes to the whole tenor of the above instruction, and that accordingly Employers' was not under obligation to ask that it be given in terms more favorable to Employers'. We feel called upon to determine whether the instruction was erroneously prejudicial. We think it was.

This civil litigation in our view should not have been complicated by this reference to possible criminal prosecution

7. 35 D.C.Code § 1312 provides:
    False statements—Penalties.
    Any director, officer, agent, or employee of any company who subscribes to, makes or concurs in making or publishing any annual or other statement required by law, knowing the same to contain any material statement which is false, shall be fined not more than $5,000 or imprisoned for not more than five years, or both. (Oct. 9, 1940, 54 Stat. 1069, ch. 792, Ch. II, § 9.)

of the general manager. This is not to say that Section 35–103 itself had no place in the trial. A failure on the part of the general manager to comply with the requirement of that section in signing and swearing to the annual statement could well be considered by the jury in determining whether or not he engaged in fraudulent or dishonest conduct, and if so, whether the evidence connected such conduct with the loss. But to imply the availability of criminal prosecution—perhaps the commission of a crime established by proof beyond a reasonable doubt—had a tendency to lead the jury to consider the general manager's signing of the statement in a more serious light than otherwise the jury might have done. Moreover, for the company to have been required to defend as it were against the indicated possibly criminal conduct of the general manager would be unduly prejudicial, even though some logical relationship between the civil and the criminal aspects of the matter could be thought to exist.

To portray the conduct of the general manager to be such as to bring him into possible conflict with the criminal law, if error was by its nature prejudicial. That it was error is emphasized by failure of the instruction to make clear that to come within the criminal provisions the general manager must have made a material statement known to be false. Under Section 35–1312, as under the policy, the question for the jury would be whether the general manager's failure to note the surplus risk policies in the 1963 annual statement was a negligent omission, a business judgment, or, on the other hand, dishonest or fraudulent. With the support of Imperial's accountant he testified that Section 35–103 did not require the recording of commitments on which no policies had

been issued, premiums received, or losses reported. The first sentence of the instruction in referring to the criminal statute, Section 35–1312, correctly indicated that criminality attached to a "knowing" false statement. In the next sentence, however, referring to the facts of this case, the instruction attributed fraudulent and dishonest conduct to the general manager if he signed and swore to the statement if it "did not contain, or could not contain" the data about the risks. Aside from other problems raised by this instruction,[8] we think to permit the jury to find a fraudulent or dishonest state of mind from the signing of the statement was reversible error.

The case of Lucy Webb Hayes National Training School v. Perotti, 136 U.S. App.D.C. 122, 419 F.2d 704 (1969), referred to by Judge Leventhal, develops the several problems of admissibility and weight to be accorded a licensing regulation, related to a patient's safety in a hospital and alleged to have been violated in a case of death charged to the negligence of the owners or operators of the hospital.

Whatever relevance the *Perotti* case might have to the admissibility of the requirement of Section 35–103 that the general manager file an annual statement of Imperial's financial position, there is no suggestion in *Perotti* that the jury in our case could properly consider the criminal penalties which might flow from a violation of Section 35–103 any more than *Perotti* indicates that it would have been proper there for the jury to consider any criminal sanction which might attach to a violation of the regulation involved in that case.

Other questions raised do not require discussion. We find no significant error except as stated in Part IV of this opinion.

---

8. For example, because the criminal provision speaks in terms of material false statements, not omissions, it should have been explained under what circumstances an omission could cause other statements contained in the report to be materially false. Moreover, we find no evidence that the annual statement itself, whatever its defects, caused the loss sustained by Imperial. Furthermore, if the concealment was related to the loss, the instruction should have focused upon such relationship rather than upon possible criminal conduct.

Reversed and remanded for further proceedings not inconsistent with this opinion.

LEVENTHAL, Circuit Judge (concurring):

I concur in the result and in parts I, II and III of the majority opinion.

As to part IV, the matter arose at trial with appellant's general objection to the "statement concerning criminal prosecution under the statute." It is my view that anti-fraud criminal statutes do have a place in a civil action seeking to establish fraudulent conduct. Criminal statutes imposing a standard of care have an evidentiary bearing on the issue of negligence (or gross negligence) in a civil suit. Similarly the fact that the legislature considers certain misrepresentations to be of sufficient moment to justify criminal sanctions is, I think, the kind of information which can properly be placed before the jury, on an evidentiary and not conclusive basis, to guide them in assessing the materiality of a particular misrepresentation in a civil suit.

I concur in the result reached by the majority in part IV because I do not think the evidence presented by the defendant laid an adequate basis to enable the jury to be fairly informed whether appellant's was the kind of conduct contemplated by the criminal statute as administered by responsible authorities.

Dandrige testified that he had long experience in the insurance business and that it was his belief that it was the practice not to report policies on which no premiums had been paid in the annual statement, and that had he thought such disclosure required, he would certainly have made it. Although the Deputy Superintendent of Insurance was called by appellee as a witness, he gave no testimony as to whether those charged with the administration of D.C.Code § 35–1312

considered the failure to disclose policies of this type to be a violation.[1]

In Lucy Webb Hayes National Training School v. Perotti, 136 U.S.App.D.C. 122, 419 F.2d 704 (1969) we noted that regulations and statutes which have a possible bearing on the issue of negligence "are often enacted with the reasonable expectation that the * * * authorit(ies) will exercise some judgment in appying the general rule to the specific case." (419 F.2d at 712). And we also made clear there that the trial judge, after hearing the testimony of the appropriate public official, "must determine whether the regulation is applicable to the case at hand before admitting it into evidence." (419 F.2d at 713). I believe the same predicate is requisite before the jury can be advised of an anti-fraud statute which is subject to the discretion of the Superintendent of Insurance in its application. Because this predicate was not laid, I concur in reversal.

If we proceed to an alternative ground of decision, and assume that some reference to the criminal statute, § 35–1312, was permissible but the particular reference was improper, I do not see either that the objection was preserved or that the plain error rule is applicable. The general objection against any reference whatever to the criminal statute did not alert the judge to the alternative objection that the particular instruction was defective. The District Court set forth the "knowingly" requirement in its basic reference to the statute. This word was not repeated in the next sentence when it advised the jury that conduct in violation of the statute would be fraudulent and dishonest within the terms of the bond only if it was the cause of loss to the appellee. In view of the District Court's repeated emphasis throughout its instructions on the requirement that fraudulent or dishonest conduct must be knowing, willful and

---

1. I do not think it conclusive in favor of appellant that in fact no criminal charges were referred. The individual responsible was no longer employed by the Company.

The Superintendent may have considered that prosecutorial discretion was best exercised by not pressing charges although there had been a violation.

intentional, I think counsel was under a duty to object at trial on the ground that the word "knowingly" had not been re-iterated in the particular sentence. Had an objection been made, the District Court undoubtedly would have taken corrective measures.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge, in Chambers.

### ORDER

PER CURIAM.

On consideration of appellees' petition for rehearing, it is ordered by the Court that appellees' aforesaid petition for rehearing is hereby denied.

PER CURIAM:

In denying the petition for rehearing we emphasize that our decision for reversal does not rest upon what our dissenting colleague refers to as a slip of the tongue of the trial judge. Part IV of our opinion, which explains the prejudicial error we find in the trial, is solidly based on the trial judge's reference in his instructions to the possibility of criminal prosecution of appellees' general manager. As the opinion points out this reference was prejudicial error because it erroneously tended to lead the jury to consider in a more serious light than otherwise it might do the general manager's signing of the statement required by Section 35–103 of our Code. We also pointed out the prejudice in the requirement that in this civil action appellant defend as it were against the possibly criminal conduct of the general manager. Having for these reasons found prejudicial error we added that the error was emphasized by several factors then mentioned, one of which was the omission in the instruction to advise the jury that the statement filed under Section 35–103, in order to violate the Section must

have been "knowingly" false. This factor, however, was not essential to the decision already reached.

Our dissenting colleague thus misconceives the basis for our reversal. Moreover, turning now to the omission itself, inadvertent failure to advise the jury the statement must have been "knowingly" false would not cure the error; for the effect on the jury must be judged by what the judge actually said to the jury rather than by what he intended to say. The jury was not present during the discussions between court and counsel as to the proper wording of the instruction.

We accordingly are unable to accept as justified the statement of our colleague to the effect that our decision causes a waste of the valuable resources of trial judges and juries; for these strictures are due to a portion of our opinion which is not essential to the decision reached, and which referred rather to matters which added support to the decision.

Circuit Judge LEVENTHAL dissents from the foregoing order and opinion.

LEVENTHAL, Circuit Judge:

I dissent from the denial of the petition for rehearing and wish to observe that on reconsideration I dissent from the judgment of reversal.

I concurred in the result of reversal when first announced by the court because I was of the view appellee did not lay an adequate basis to allow the trial judge to rule that appellant's conduct fell within the purview of D.C.Code § 35–1312 as that statute is applied and administered by the cognizant officials—a ruling that must be made before the existence of criminal sanctions can be put before the jury on an evidentiary basis.

On further examination I find that an adequate basis was presented by appellee, but objected to by appellant.[1] Hence I

---

1. I undertook to read the entire testimony of the Deputy Superintendent of Insurance, called as a witness by appellee, only a small portion of which was reprinted in the Joint Appendix filed on appeal.

The transcript reveals that appellee did attempt to elicit from the Deputy Superintendent an explanation of the policy of the Department with regard to the conduct in issue. Appellee offered to

agree with the contention in the petition for rehearing that a new trial in this case would be both an injustice to the appellee and an unnecessary waste of the trial court resources which have already been devoted to this litigation.

Material focused in the petition for rehearing reinforces the view I previously expressed, that the error which the majority found in the instructions was a slip of no consequence. The instructions had been discussed with the judge in chambers at length. The motion for new trial filed by appellant did not mention the circumstance that the judge omitted the word "knowingly" in this particular sentence when he gave the oral instruction to the jury. As I have already indicated, the concept of "knowingly" pervades the instruction in any real sense.

Instead of reversing the judgment on the ground of prejudicial error, I would be more inclined to upbraid counsel who presses for reversal on a point he regarded as of little consequence at the trial.[2] He does not claim that the omission of the word "knowingly" was sought by appellee. Apparently he could not legitimately have made such a claim, since appellee's requested instruction contained the word knowingly, as set forth in its petition for rehearing.[3]

The use of the time of our trial judges and juries is a valuable resource. We should not hesitate to use it in order to serve the interest of justice, and overcome substantial prejudice. In my view no showing of substantial prejudice has been made in this case. All that is involved is a slip of the tongue, which was not called to the attention of the trial judge, and was more than offset by the remainder of the charge, which avoided any possibility of actual prejudice to appellant.

This discussion is to be read in the context of the opinion I filed May 28, 1970, stating that the instruction as a whole made it clear that fraudulent or dishonest conduct within the terms of the bond must be knowing, willful and intentional, and that it was proper for a jury considering the materiality of a particular misrepresentation or omission in a civil action to have before them the information that such conduct, if appropriately established, would constitute a violation of a criminal statute.

I would affirm the judgment, and hence respectfully dissent.

---

show that the Department treated this as an extremely serious matter, jeopardizing the license of the company, because Dandridge had withheld material information which the Department viewed as a fraudulent act under the statute. The reason that this line of inquiry was not pursued was that counsel for appellant objected, and this objection was sustained by the trial court. Counsel for appellant argued, "He wants to say there would have been something done about this had Mr. Moore [Vice President and Secretary of Imperial] not done something. What in the world has that got do with the issue in this case?" (Tr. 534) Under these circumstances appellant cannot be heard to complain of the failure to lay a predicate for placing § 35–1312 before the jury.

2. We should guard against the use of "subsequent logical parsing" to "uncover pos-

sible confusions and misapprehensions in the printed record that were not fairly present in the aura of the court room. * * * The sport of syntax should not be indulged when trial counsel did not make timely objection except in a clear case of prejudice." McGill v. United States, 121 U.S.App.D.C. 179, 185, 348 F.2d 791, 797 (1965).

3. Counsel for appellee states he was not aware until the opinion issued that the requested instruction was not part of the record before the court. If appellant's counsel wished to bring this matter up on appeal it was his duty to search out the relevant portions of the trial record so as to put fairly and completely before the appellate court a point being presented to it more or less on a "plain error" basis.